This proceeding was instituted before the Public Service Commission by complainant, and had for its purpose the prevention of the promulgation and enforcement of certain rules and regulations proposed by the Kansas City Power Light Company, called the relator or appellant, regarding the kind and character of fuse and switch box which prospective consumers of electricity in Kansas City should install as a condition precedent to being supplied with an electric current by the Power Company.
It may be proper to state that a fuse or switch box is the covering or enclosure for switches installed on the premises of consumers for the purpose of cutting off and turning on current coming from the service wires of the utility and before it enters the meter installed for the measuring of the current used by the consumer. The fuse is a piece of soft lead which fits into the switch, which is so designed as to automatically melt and sever the connection in case the service wires become charged with an unusual and dangerous current of electricity. In Kansas City the meters are owned by the relator. They are in all cases installed so as to connect with fuse or switch boxes.
Prior to the promulgation and enforcement of the rules and regulations of relator in question, consumers in Kansas City customarily supplied metal meter boxes of ordinary construction. They were required to so do as a measure of fire protection by the city authorities, and such practice, it appears, was also required by the insurance underwriters. Moreover, as was undisputed, *Page 319 
this box of ordinary construction so used fully met the requirements of the city and the underwriters.
The McCanles-Miller Realty Company, together with other companies and persons, filed a complaint with the Public Service Commission, wherein the rules of relator here in question were charged to be unreasonable and oppressive, in that by reason of the promulgation and enforcement of the rule complainants and other consumers were required to purchase and install a particular box which was manufactured under patent, and the selling price of which was extortionate and excessive over and above the cost of the ordinary boxes, which were adequate for the consumers' needs, to the extent of $2.50 per box as against 50 cents per box; and in that in addition the effect of the rules and their enforcement was to require the use of a separate box for each consumer in an apartment house, whereas formerly one large box had been sufficient; and in that the cost of installation was greater; and in that the benefits of the new box over and above the old box, if any, inured to relator and not to the individual consumer; and in that the rules and the manner of enforcement was unreasonable, unjust and discriminatory; and in that they necessitated an expenditure by complainants alone in the building and equipping of apartment houses in Kansas City of more than $25,000 yearly over and above the cost of installation of the old boxes. The prayer of the complaint was that the rules and regulations be declared void and of no force and that defendant be prohibited from enforcing the same.
Relator, the Power Company, filed an answer asserting that the rules and regulations were promulgated and enforced for the purpose of bringing about standardization of equipment and uniformity in the conducting of defendant's business, and that the same promoted safety to lives and property, and lessened the cost of operation and maintenance both by the consumer and the company.
The rules in question had not been filed with the Commission by the relator. During the hearing relator asked permission to file the same as a part of its schedule *Page 320 
of rates and regulations. The Commission made the following report:
Upon a full hearing of evidence, oral argument and briefs filed by the parties the Commission handed down a report wherein it found that the new box required by the rule was made under patents as alleged and that the cost of it, including top, was $2.69 per box; that the total cost of the box and its installation was from $5 to $6 more per meter, that is to say, per consumer, than the cost of the old boxes and their installation; that the added cost to complainants was from $18,000 to $20,000 per annum, and to all consumers in Kansas City approximately $40,000 per annum.
The Commission found that the new boxes had some advantages, both to consumer and relator, over the old boxes, but that a substantial objection to the rule was that it required a particular type of box obtainable only from restricted sources, and at high cost; that the advantages accruing from the new boxes were in favor of the relator more than the consumer.
The Commission pointed out that the price of boxes insisted upon by relator could more likely be reduced if the installation was made by the relator and charged to its capital account; and found that the boxes advocated by the relator were so closely identified with the installation and testing of meters as to probably justify the approval of a rule permitting relator to furnish the same and charge to its capital account if request were made by relator so to do.
The report concluded by holding that the rules as promulgated could not be enforced: first, because they had not been properly filed; and second, that they should not be filed because in the opinion of the Commission they were arbitrary and unreasonable.
An order was entered in conformity with the report prohibiting relator from further enforcing the rules in question. Motion for rehearing was filed, additional evidence had and rehearing denied. This proceeding by certiorari was instituted in the Circuit Court of Cole *Page 321 
County, the case there submitted, and the order of the Commission affirmed. Appeal was then taken to this court.
The rules in question were as follows:
"620. The customer is required to furnish an iron entrance box with fused service switch, and install same at the point where service enters the premises. The company will ordinarily furnish the conductor from the company's lines to the point where the service enters the premises.
"621. The iron entrance box with switch and cut-out shall be arranged so that no live parts can at any time be exposed, and shall be connected to the entrance conduit by continuous rigid, iron conduit. The box shall allow sealing to prevent exposure of any live parts, and shall provide for an enclosing device for meter terminals. Two and three-wire entrance boxes up to and including 100 amperes must have an externally operated switch. Load side fuses, accessible to the customer, are required on all circuits, including single circuit installations. The entrance box used must be approved by the engineering department.
"622. The customer will be required to furnish all fuses of an approved type and in accordance with the National Electrical Code. Where the customer desires the company to re-fuse, a charge will be made to cover the cost.
"623. The company reserves the right to require a load side switch as a ready means for the customer to cut off the supply of current. Such is required particularly for stove circuits.
"624. For duplexes, flats and apartments, a main line iron entrance box with fused externally-operated service switch is required in addition to the iron service boxes with fused service switches for the individual customers.
"625. Specifications for `standardized' iron entrance box with fused service switch and cut-out: *Page 322 
"a. Knock-outs shall be provided in entrance box on sides, ends and back to allow service and load wires to enter or leave through conduit or bushings.
"b. U-shape twist-outs shall be provided in entrance box on sides to permit connection with troughs instead of conduit pipe in banked installation.
"c. Grounding lug and substantial clamping screw shall be provided for grounding the box.
"d. Parts of the entrance box must be so fastened together that a complete ground circuit through all parts of box is maintained.
"e. Door of box must be hinged to the bottom end wall.
"f. Entrance box must be free from any openings, slots or cuts.
"g. Meter test clips (`standardized') must be provided on the cut-out switch.
"h. Switch operating handle shall be externally accessible and shall be pivoted at both ends in the side walls of the box.
"i. Lock-off shall be provided independent of the cover for locking the switch in `off' position.
"j. Meter end of box to be constructed to fit `standardized' meter trim. Boxes must be installed with blank end wall."
In connection with the promulgation of the rules relator issued a circular letter which indicated that one certain box met the requirements of the rules.
It was admitted by relator's superintendent that relator in the enforcement of the rules, and presumably under the provision of Rule 621 that "the entrance box used must be approved by the engineering department," required the installation of the particular patented box in question and permitted no other. A box of the kind required was introduced in evidence and it is undisputed that it is manufactured under patents and sells for $2.50 without the top, or $2.69 with the top; that the cost of the box and installation over and above the cost of the box *Page 323 
of ordinary construction is between $5 and $6 per meter that is to say, per consumer.
Complainants introduced in evidence a letter from one of the group of companies manufacturing the box, wherein a manufacturer explained the reason for the high selling price, as follows:
"Boston wanted a different switch than Detroit, Detroit different from Chicago, Chicago different than any other city and Kansas City wanted them still different, which caused us to change our design many times, with large loss to stock and tools, which loss must be by correct methods of manufacturing absorbed by this line of material, and until such time as the changes and experimental stage has been reached, the switches must, to pay their way, look extremely high to one who can simply take the protection, as is, and make tools for just that production."
Complainants' evidence tended to show that the added cost to them of installing the new boxes in their ordinary building operations was from $18,000 to $20,000 a year in excess of the installation of the old boxes. The estimate of relator's superintendent of the added yearly cost to all consumers in Kansas City was $48,000.
Complainants also offered evidence as to the cost of various other boxes which were on the market, and which met at least a number of the added specifications of the rules over and above the specifications of the old boxes, the price of which ranged from one dollar to $1.60 for single boxes and from two dollars to $3.25 for large boxes adequate for installation of a number of meters each. Evidence was introduced that the boxes of ordinary construction could be so changed or converted as to contain a feature particularly emphasized by relator's witnesses, to-wit, externally operated switch, at a slight additional cost.
O.H. Horner in his testimony recommended rules which would accord with the "latest regulations of the National Board of Fire Underwriters," and the Commission mentions such national board approvingly in its report (14 Mo. P.S.C. 341), and it appears from the *Page 324 
evidence offered on motion for rehearing before the Commission that the latest rules promulgated by the National Board of Fire Underwriters for 1923 were in all respects the same as the company's rules, yet the Commission disallowed the rules.
W. Lee Smith, builder of apartments, testified that an engineering firm had quoted him a price or cost of $97 for installing the boxes approved by the company in a twelve-apartment building.
The evidence for appellant was as follows:
A.E. Bettis, an employee of the company eighteen years and now a superintendent, testified that the purpose of the company's rules adopted July 1, and suspended by company until September 1, 1922, using the new standardized safety box, was to standardize its service so that it could give better and safer service, reduce fire hazard, reduce liability to personal injury, and also reduce the theft of current; that neither the company nor anyone connected with it has any pecuniary interest in the manufacture or sale of the boxes; that the large list of the contractors and jobbers to whom new rules were mailed is shown by defendant's Exhibit 1, and that the last letter sent out giving contractors the names of the different manufacturers of the new box is shown by defendant's Exhibit 2; that to middle of March, 1923, over 4,200 of the new boxes had been installed without objection by anyone excepting Mr. La Pierre. That as a result of defective installations with the use of the old multiple box and other equipment in use prior to the company's rules, several of the company's men and its patrons have been burned; that with the switches and fuses enclosed in a sealed box with an external handle there is no chance for such injury. That defendant's Exhibit 4, a board with fuses attached, on file with this court, shows fuses blown in open (not enclosed) construction, which fuses were originally put in for safety valves to disconnect the customer's premises, but instead have been attempted to be repaired and thereby endangered the customer's premises with fire, which occasions *Page 325 
are frequent, but which, with fuses enclosed, and external switch, do not happen; and that the box adopted by the company is larger with more clearance and has many other advantages described by the witness over the two smaller substitute boxes proposed by the complainants. That the objections to a multiple box with an external switch are as follows:
"In this large multiple box we find that the door is left open and it is accessible to anybody and there is a long line of switches there accessible to the janitor or anybody looking for trouble and he immediately begins to examine all of them, thus causing everybody in the apartment trouble. It causes trouble to the lighting, and where fuses have been switched causes trouble. The wiring coming into such a box is not insulated so that it is safe against fires or against the people who want to `by pass' the meter and steal current, and there is no standardization to it at all. The boxes will be located in any manner on the board. The meters consequently have to be put in all kinds of locations with wires running in every direction, which makes in all a very abominable installation, both to the company and the consumer for service." That typical defective installations under the old rules and improved installations under the new rules are shown by a set of photographs.
That the same rules promulgated by the company are in effect in 150 other cities; shown by list of such cities prepared by the witness; that similar rules effective January 1, 1923, for the municipal light plant of Kansas City, Kansas, have been adopted, as shown by statement of the commissioner and city electrician of that city; and that it is the opinion of the city electrician and chief of the fire department of Kansas City, Missouri, that the company's rules are reasonable, a marked improvement upon the old methods and promote safety, both to persons and property. That similar rules were promulgated by the Public Utilities Commission of the State of Michigan on February 1, 1922, requiring entrance boxes to enclose switches and fuses with external *Page 326 
handles, and sealed or locked so that unauthorized persons cannot tamper with the switch or fuse excepting that in an emergency the owner may remove the seal on notice to the company.
That the witness submitted specifications to and secured bids from three contracting firms showing cost of installation under the old practices and under the new safety rules in a four-apartment, eight-apartment and twelve-apartment building and an eight-room dwelling.
That nearly every lighting company has either standardized or is now working on standardized rules; that such standardized rules save expense in serving the consumer, furnish better service, and are for the safety of the consumer; and that any saving by the company from the rules is reflected in its rates for service under modern regulation of its rates, and in the final analysis the whole body of patrons get the benefit.
That the cost of the safety box and its installation is about $6 in excess of the old box and installation and that there are about eight thousand installations per year, which would make the total cost of the safety rules over the old rules only about $48,000 per year in the entire city of Kansas City.
That within the knowledge of the witness lots of people, both consumers and company employees, have been injured in operating the switches, and that is the reason for enclosed switch with external handle.
That the company's rules do not require use of boxes manufactured or sold by any particular company or person, but simply specify a standard make of box and will approve any box by whomsoever made or sold, which meets specifications; that complainants' Exhibit 7 is as much patented as company's box; and that purpose of rules in requiring approval of box by the engineering department of the company is because expert engineers know more about the boxes than laymen who will look only to the economical phase of question; that the rules would amount to nothing if left to the customers and must be left to the engineering department to be efficient. *Page 327 
That the company engineers worked on the rules two years, investigating the rules in force in all the large cities, and followed the recommendations of all bodies, such as the National Electric Code, in order to give the best possible service in Kansas City.
That a great many patrons put in their own fuse plugs and under the old practices many costly fires resulted from faulty electric installation, it appearing from a publication by the National Board of Fire Underwriters, dated January, 1922, obtained by the witness from the Missouri State Insurance Department, that the losses in Missouri alone due to electrical fires for the five years 1916 to 1920 amounted to the enormous sum of $2,790,192, or an average of $558,038 per year.
That the cost of the company's box is $2.50 and of the box proposed by complainants is $1.72.
That the National Electric Code promulgated by a national board representing the insurance companies of the United States is a recognized authority on the subject of electrical wiring and is mentioned in the Commission's report; that the rules proposed by the complainants in this case recommend that the entrance boxes, etc., comply with this National Code; and that the latest National Code for 1923 recommend the same rules as the company.
That rules the same as the company's requiring sealed boxes with external switches, were also promulgated by the State Department of Labor Industry for the State of Pennsylvania, effective March 1, 1921, and the urgent necessity for adopting the rules in Pennsylvania are stated in the State Department's circular.
That the advantages and necessity of the standard boxes appear from the letter of J.C. Langdell, whose companies had 50,000 standard boxes installed February 1, 1923:
"The advantages to the central station are many in the use of the standardized switch. It reduces their hazard in view of the fact that it is all-steel enclosed; it provides a cabinet of ample dimensions in order that the *Page 328 
meter testers can safely and economically test their meters. I have in mind a central station in Michigan that had ten testers burned in the use of the old type of enclosed switch, which does not provide sufficient room for the testers to safely test the meter. . . . You will find other advantages listed in the attached paper. . . . The Michigan commissioners are very enthusiastic over the work we have been doing in the standardization movement, and I cannot understand the attitude of any commission that takes the stand of objecting to the proposition which has been adopted in over 300 towns and cities throughout the country.
"The practice of customers renewing the main line fuse is one of the greatest electrical fire hazards that exists today. . . . He showed by actual statistics that sixty per cent of the so-called electrical fires were caused by the abuse of the main line service. A further survey shows that this hazard is increasing and did increase from 1917 to 1921 approximately twenty-five per cent. . . . We are finding approximately five per cent to eight per cent of all services have been plugged, destroying all of the protection which the city electrical department and underwriters require should be installed. . . . This item alone would be of sufficient evidence to convince any utility commission that the public utilities in recommending the standardized movement are doing something of a great deal of benefit to all the consumers."
That an objection to the use of a multiple instead of individual boxes for apartments is that with a great many switches in the multiple box, you have a great many troubles that are inherent in the operation of these switches, renewing the fuses, and so on, because they are in one box; that a customer in attempting to change his fuse plug or make repairs would not know his switch and fuse; and that there would be confusion.
That it appears from a bulletin issued by the Missouri Insurance Department in June, 1923, that the damages from electrical causes have been reduced from $20,780,307 *Page 329 
in 1918, to $12,723,209 in 1921, and in the opinion of the witness this reduction of fire loss has been due to such rules as promulgated by the company.
That under the company's rules the boxes are made to fit the meters placed above the boxes with no exposed wires between the meters and boxes; and that the company does not in effect require one big box made of a lot of little ones, but individual boxes; that the safety boxes protect the customer in changing his outside fuses, etc., on his branch lines the same as on main line by operation of the external switch, etc.
John T. Dysart, an employee for twenty-five years and now superintendent of city lighting of the company, testified that over a period of years men working under him have received burns from the old type of installation; that the company has been required to defend suits on account of the patrons' defective installations; that the company sends its men out to renew fuse plugs without any charge for their time at a nominal cost of only twenty-five cents for first two fuses and fifteen cents for every two additional fuses furnished; and that he has never known of an injury from the new equipment.
A.E. Herzberg, with B. R. Electric Jobbers, testified that advantages of box approved by the company in addition to those testified by Bettis, are that the door drops down and gives one's hand full clearance of all metal parts and the box prevents stringing out of additional conduit or wire trough; and that the little box, 4 by 9, costs 31 to 45 cents; Exhibit 6 costs $2.50; Exhibit 7 costs $1.75; would not handle the small box and does not know the cost of it; in Exhibit 3 there is no switch as in Exhibits 6 and 7, which switch costs 44.1 cents plus cost of additional labor on Exhibits 6 and 7; that after twenty-five years of practical experience witness knows result of sloppy work and poor construction and thinks there is much more than $50,000 benefit to Kansas City per year in the new safety rules.
W.L. Hutchison, an alderman and electrical contractor for thirty-four years, testified to the advantages *Page 330 
and value of the larger company box (Exhibit 6) over the smaller proposed box (Exhibit 7), and then especially to the advantages of standardization:
"Indeed I do; I think they are a thing that has been needed for a long time. It has just been from the lack of somebody perfecting something that could be used with safety and something that was standardized. During my experience in the electrical business I have seen practically all electrical apparatus standardized. Knowing that this case would come up this afternoon and being an alderman here and being interested in it and knowing of the city rules and the underwriters' rules, is the reason I am here. Now one reason for standardizing boxes or fittings is this: In case you want to use somebody else's make of a fitting, you may do so, such as a switch box that goes in the wall. It used to be that if you put in a certain manufacturer's box in a wall, you would have to go and find out who manufactured the switch that would fit that box. After you got your switch, you would have to go and find out who manufactured the switch plate and fit the switch. But now, with all such boxes and things, contractors, if they have any experience, know that practically all the stuff is standardized. Our conduit is built according to specifications, and we buy the same parts for every foot of conduit, regardless of whom it is manufactured by; the same way with our wire, the same way with our sockets and attachment plugs. All attachment plugs fit the same sockets. We used to have the Westinghouse, the United States socket, and the General Electric, but that has all been standardized by the underwriters. Now the underwriters approve lots of manufactured articles that comply with the rules submitted to them, and they are approving many things that are standardized and are put on the market. Things are put on the market offered at cheap prices, and people who are in the habit of wanting to put in cheap stuff are usually the victims of purchasing that stuff; they have got to unload it on somebody and there is always somebody that wants to get something for nothing; and of *Page 331 
course stuff that is made cheap and still comes within the rules of the underwriters is approved. Now we have a city ordinance here that is a little bit different; they enforce the underwriters' rules and there are other rules we have. For instance, in the underwriters' rules, when we were talking a while ago — pardon me for going along in a haphazard way, but I am giving it to you now from my standpoint as a city official, to look out first for the interests of the public — the underwriters approved a switch and it states in the underwriters' rules that, when entering the building, the service switch must be protected by a fuse. Now in Kansas City, from numerous accidents by various electricians or householders and owners, in opening switches, and such as that, the city electrician made a ruling, and it is a part of the ordinance to that effect, that all switches installed, all service switches, you must enter the switch before you do the fuse, because there is hardly ever any repairs on a switch, so when you open up your switch your fuse is dead. Now the reason that was brought about was by our experience. I am surprised at people stating they have been in the electrical business for fifteen years and never heard of anybody getting burned. I think that they, themselves, if they had had that much experience, would have been burned themselves unless they were really lucky."
John J. McGee, an electrical contractor with sixteen years' experience, testified that at first he opposed the new rules, but now favored them; that he concurs in the testimony of Bettis, Hutchison and Herzberger as to the benefits of the new rules; that each new installation costs $5 or $6 more now, but as his men become more familiar with it, the cost will be less; that in the opinion of the witness the multiple box for six apartments would be more expensive than separate boxes and that he could not want the meter, for his apartment ties up with others in the building.
A.E. Bettis fully explains in his affidavit, filed with the Commission, that the multiple box proposed by the witness Horner for complainants as shown by the complainant's *Page 332 
Exhibits 12 and 13 is wholly impractical, not provided for by the rules of any lighting company in the United States, and in the opinion of affiant would cost as much or more than the boxes specified in the company's rules; and the court's attention is called especially to this affidavit; and also the testimony of Bettis criticising the box (Exhibit 7) proposed by the complainants as a substitute for the standard box (Exhibit 6) approved by the company is summed up in the Commission's report (14 Mo. P.S.C. 342):
"Comparing complainants' Exhibit 6 (the box approved by defendant) with complainants' Exhibit 7, defendant's witness Bettis stated that said Exhibit 6 was larger than said Exhibit 7, had more clearance, permitted the making of common trough connection between a series of boxes, permitted attachment of standard porcelain branch boxes to the two sides and bottom, had a much better switching arrangement and had more insulation around fuse-plug ferrules, had meter-testing clips and that these advantages were more than enough to cover the difference in cost of the two boxes. Mr. Bettis stated further that complainants' Exhibit 7 could not be adapted to installation in apartment houses, due to the fact that no common trough connection could be made between a series of boxes, and as a result would necessitate the installation of conduits between boxes and make the cost of installation excessive."
It thus appears that the cost of the standard safety box, Exhibit 6, including installation, over the old equipment (which no one could seriously recommend) used prior to the new safety rules in the entire city of Kansas City would amount to only about $40,000 or $48,000 per year; that the cost of the larger standard safety box, Exhibit 6, over the cost of the smaller inadequate box, Exhibit 7, proposed by the complainants, amounts to only 78 cents per box or only about $6,240 (8,000 installations) in the entire city per year; that the cost of the electric fires in Missouri averaged $558,038 per year from 1916 to 1920; that probably on account of such improvements *Page 333 
as have been adopted by the company in this case, the damages from electrical causes have been reduced from $20,780,307 in 1918 to $12,723,209 in 1921. That in view of these and the many other facts established by the evidence, the cost of the standard equipment in the entire city is nothing as compared with the necessities of the case.
In proposing to substitute the smaller and cheaper box, Exhibit 7, for the larger and better box, Exhibit 6, the complainants recognized and in effect admitted that the old haphazard equipment and their proposed multiple box were out of the question; and the case simply comes down to the question whether the fact that the larger and more adequate box, Exhibit 6, will cost the insignificant sum of only about $6,240 more per year for the entire city than the smaller and inadequate box, Exhibit 7, is a sufficient reason for disallowing the set of standard rules adopted after thorough investigation by disinterested and competent engineers for the protection of life, limb, property, etc.
I. Counsel for appellant first insists that this court will review the judgment of the circuit court in this class of cases the same as in equity cases, de novo, without being bound by the finding of the Public Service Commission or that ofReview. the circuit court. We have always held that this class of cases are tried as cases in equity, and like equity cases we will presume the findings of the commission and circuit court are correct, yet they are not binding upon this court where we think the evidence does not support their finding, or where their findings are against the great weight of the evidence. In such cases we have always held we will review the evidence and make our findings as we do in all equity cases. [R.S. 1919, sec. 10522; Railway v. Pub. Serv. Comm., 266 Mo. l.c. 340; Lusk v. Atkinson, 269 Mo. l.c. 118; State ex rel v. Pub. Serv. Comm.,271 Mo. 155; State ex rel. v. Pub. Serv. Comm., 287 Mo. l.c. 531.] *Page 334 
This seems to be the position of counsel for respondent also.
II. Counsel for appellant next insists that the Public Service Commission had no right or jurisdiction to supervise or regulate its rules. This insistence is entirely too broad. The law seems to be that the company is entitled to the privilege of managing its own business in its own way, so long as it doesRegulation. not injuriously affect the health, comfort, safety and convenience of the public. This of course includes the right to regulate the compensation charged by the company for the services rendered, which must always be reasonable and just on both sides. The appellant seems to have had this power of the Commission in mind when it invoked its jurisdiction for leave to file the rules now in question with the commission. And the following authorities seem to give the commission jurisdiction to pass upon the reasonableness of rules and regulations of public utilities affecting the service rendered by them to the public: Sec. 10478, R.S. 1919; State ex inf. v. Gas. Co., 254 Mo. l.c. 534; State ex rel. v. Commission, 275 Mo. l.c. 206; Railway v. Commission, 281 Mo. 52; State ex rel. Ry. v. Commission, 277 Mo. 175; State ex rel. v. Bluefield Water Co., 103 S.E. 340; B. O. Railway v. Coal Co.,215 U.S. 481. We are therefore of the opinion that the commission has in this case the power to regulate and control the rules of the appellant, so far as they affect the health, comfort, safety and convenience and reasonableness of the charge made by it for the services performed for the public.
III. Counsel for appellant next contends that the rules adopted by it on September 1, 1922, were just, equitable, reasonable and lawful, and that the Commission should have permitted them to have been filed. Counsel for respondent do not controvert this contention, but insist that the commission was justifiedPublic in rejecting the offer to file the rules for the reasonService that they were unreasonable and arbitrary. These twoRules. positions of counsel require us to finally pass *Page 335 
upon the justness and reasonableness of the rules, which will require a review of the evidence, which we will do later.
IV. Counsel for appellant contend that the real question before the court is whether the benefits resulting from the rules and the necessity for the rules adopted by the company are equal to the cost of the box and installation. This contention of the company is denied by counsel for respondent, and theyQuestions add that the real question is "whether the benefits toat Issue. the complainants and other consumers and the necessity from the standpoint of complainants and other consumers equal the cost of installation." While these contentions may be of like importance in the consideration of this case, there is not one whit of difference between the parties regarding the same. At most it seems to be a process by elimination by the parties. They are trying to limit the question in dispute to the smallest compass.
V. The complainant's opposition to the rules proposed is one solely of economy. Its counsel insists that the old switch boxes cost not to exceed one-third the cost of the new boxes, that they are practically as good, safe and convenient asInstallation the new boxes. The finding and report of theof Switch Boxes: Commission was substantially with theEconomy and complainants upon this insistence and counselBenefits. for appellant do not seem to controvert it, in so far as the cost of the two boxes is concerned, but the appellant contends that the new boxes proposed to be installed are much safer, more convenient and economical when once installed and much more beneficial to the city and her inhabitants in the protections of life and property from fire — even the destruction of the city from the same cause. With this idea in view, it seems that three hundred public officers and public commissioners throughout this country have approved just such rules as are involved in this case, and it is worthy of *Page 336 
notice that complainants, neither in their petition for the relief asked, nor by the evidence introduced, contradict a single benefit claimed by the company in behalf of their rules, except as to the single question of economy.
It is also worthy of notice that the insurance underwriters of the country have endorsed the relator's rules as the better means of protecting property from destruction by fire, as it is well known they are among the very first to investigate all such devices, and to adopt them to prevent fire and its losses, which this record shows has run into hundreds of millions of dollars, and to reduce the loss of life and personal injury almost to a minimum.
Common knowledge teaches us that one ordinary fire in our great cities would cost more in damage to property, to say nothing of the loss of life and personal injuries to individuals, than five times the cost of the installation of the fuses and boxes in the apartments of complainants in this case.
It also appears that the fuses and boxes prepared by the relator will prevent the theft of electric current by dishonest persons, which our own reports show has been considerable in both water and electricity in this State, which must be prevented before the relator can furnish the public with electricity at a reasonable price.
The mere fact that the boxes mentioned in this case are patented is no reason why they should not be used. That might go to the question of the Public Service Commission's approval of them if they are unreasonably high. If we were to eliminate all patented articles from public and private use, the loss to both would be incalculable, and would and could not be borne for a day without great oppression.
I do not understand that the relator's rules require any consumer to use any particular box manufactured or sold by any particular company or person, but simply specifies a standard make of box, and will approve any box by whomsoever made or sold, which meets its specifications, and if this is done then the Public Service Commission can remedy the evil. *Page 337 
If each and every person in the city may be permitted to select and install his or her own kind of a fuse and box, then there would be no uniformity in the scheme and plans to prevent fires and the destruction of property.
The fire and accident hazards of the State of Pennsylvania alone for the year of 1920 show the necessity for some such improvement as that proposed by the relator in this case. During that year in that state there were 192 fires caused by defective switches, wiring and electrical equipment, resulting in property damaged of the value of $653,434, and the records for 1918 show that there were 93 fatalities and 328 serious accidents caused from like reasons and from January to October, 1920, 58 fatal and 291 serious accidents. There are many more statistics just as glaring as this one, shown by this record, but we are drawing this case out too long to dwell longer upon this phase of the case.
We are also of the opinion that there is no special hazard connected with the standardized box; in fact, the danger is not nearly so great, for the new rules require the boxes to be made to fit the meters.
The Missouri Insurance Department in June, 1923, shows that the damages from electrical causes have been reduced from $20,780,307 in 1918 to $12,733,209 in 1921.
The mechanical experts all testify that the new boxes and fuses are much safer than the old ones, that burns and injuries caused by the old boxes are frequent and result in litigation cost.
All of this class of testimony is to the same effect.
The evidence in the record shows the great benefits and economy in the standardization of this electrical system, both to the public and the individual, which cannot be made plainer by anything further that I might say.
Great complaint is made on account of the almost conceded point that the total annual cost of the installation of the new fuses and boxes in Kansas City would be about $48,000.
What of it? The record shows that upon the other hand the saving would be more than ten-fold that sum, *Page 338 
during one year to say nothing of the loss and damage to individuals.
VI. It seems to me that no disinterested fair-minded man can read this record and reach any other conclusion than that the new boxes are far more convenient, safer and economical after installed and reduces the damages to property and life to almost a minimum. There is no question under the evidence inGeneral this case, but what the safety to property andBenefits. individuals is far greater than it is to them under the old boxes; also it is for the benefit of the public, as well as to the parties to this suit and to their employees.
Under the views herein expressed we reverse the judgment and remand the cause to the circuit court with directions to reverse the order and judgment of the Public Service Commission. Graves,C.J., concurs; Blair and White, JJ., concur in the result;Walker, J., dissents in a separate opinion; Ragland, J.,
dissents; Atwood, J., not sitting.