THE STATE at Relation and to Use of HUGH O. PUGH ET AL. v. PUBLIC SERVICE COMMISSION and THOMAS J. BROWN ET AL., Members, Appellants.—10 S. W. (2d) 946.

Division One, November 16, 1928.

298

*D. D. McDonald* and *J. P. Painter* for appellants.

*Lee A. Hall* and *John H. Cassidy* for respondents.

300

LINDSAY, C.—The appeal of the Public Service Commission is from a judgment setting aside an order of the commission which approved a schedule of increased rates, for passenger service, upon the line of the St. Louis-San Francisco Railway Company between St. Louis and certain suburban towns. The railway company, on February 11, 1926, filed its local passenger tariff number 238 with the commission providing for increased fares on ten-ride and fifty-ride commutation tickets, between St. Louis and Tower Grove, and Tower Grove and Meramec Highlands and intermediate points. Protests were filed, a hearing was had, and an order made approving the new rates. Upon the evidence and exhibits before the commission, the circuit court, upon the review proceeding instituted by the protestants, made the following findings of facts:

"1. That the St. Louis-San Francisco Railway Company wholly failed to sustain the burden of proof imposed upon it by express statutory provisions (Section 10457, R. S. Mo. 1919) justifying the increased rates sought to be charged under its schedule 238.

"2. The rates specified in said schedule are discriminatory in that they provide for a substantially greater rate per mile for certain station, e. g., Webster Groves, than for other stations similarly situated, e. g., Gratiot on the east and Valley Park on the west.

"3. The tariff in said schedule is discriminatory in that it fails to provide for a fifty-ride, sixty-day limit individual ticket for points east of Keyes Summit at a rate comparable to other localities similarly situated.

"4. The reduction of the time limit made by said schedule on ten-ride bearer tickets from ninety days to thirty days is arbitrary and wholly unsupported by any evidence justifying such change, and such change discriminates against the members of the families of suburbanites who are not regularly employed in business."

Thereupon, the circuit court reversed, or set aside, the order of the commission, and remanded the cause for further proceedings not inconsistent with the order of the court. It appears from the statement in the briefs that, after the proceedings mentioned, the railway company changed the time limit on ten-day ride bearer tickets, from thirty days as was provided in said schedule, to ninety days, thereby eliminating the question involved in the fourth finding of the circuit court. The assignment of error and the questions discussed in the briefs arise upon the first three of the above mentioned findings.

The railway company took no appeal from the judgment, and counsel for respondents suggest that the statutes do not contemplate that under the circumstances of this case the commission should take an appeal. They call attention to Section 10416, Revised Statutes 1919, as amended (Laws 1923, page 330), wherein the duties of the general counsel of the commission are set forth. They suggest that since by the section last mentioned the general counsel is required to represent the public in all rate hearings before the commission, the statute should not be so construed as to place him in the position of representing conflicting interests—the public before the commission, and the utility company before the courts. However, the section referred to also requires the general counsel to represent the commission in all actions in reference to any act or order done or made by the commission; and the commission, by Section 10525, is given the right to appeal from any judgment rendered in any review proceedings; so that the right of the commission to appeal herein, and the duty of the general counsel to represent the commission, cannot be doubted.

The record shows that prior to the filing of the schedule for increased rates, the railway company had made application for permission to discontinue this service, on the ground that it was being rendered at a loss, and the commission denied the application in part. Having made a finding in that proceeding that the service entailed a loss, and having ordered a continuance and permitted an increase in rates, the commission doubtless thought its action should be sustained, and took this appeal.

The commission and the circuit court, upon the same evidence reached opposite conclusions upon the question whether an increase in rates was justified, and also upon the question whether the rates were unjustly discriminatory. The case is here for determination upon that evidence; and, under the uniform rulings of this court the evidence is to be considered *de novo;* and, while on the one hand it is urged that under the provisions of the statute, the findings and order of the commission reach the circuit court with the presumption of right action, and on the other, that the findings and order of

the circuit court reach this court with the presumption of right action, nevertheless, the cause is here for determination as in a suit in equity, and this court is not bound by the findings of the commission, nor by the contrary findings of the circuit court. [State ex rel. Power & Light Co. v. Public Service Commission, 310 Mo. 333, and cases there cited.]

The first inquiry is directed to the question whether under the evidence, the commission was justified in granting the increase in rates. In the determination of this question there was, and is, no inquiry into the value of the property used in rendering the service, nor of a net return upon a valuation of the property so used. The question is one merely on the one hand of revenue derived from the service, and on the other of the cost of the service. The testimony and the exhibits introduced on behalf of the railway company were to the effect that for the year 1923, the revenue from this service was $150,099.46, and for the year 1924, $125,887.26, and for the year 1925, $87,841.95. This testimony, as to the revenues, was accepted by the commission, there being no countervailing testimony.

On the question of the cost of the service, the protestants introduced James D. McSpadden, a public accountant, who testified that he had examined and analyzed the annual reports of the railway company made to the Public Service Commission, and from those reports and other information, had made tabulations of the expenses under various headings; and these were introduced in evidence as exhibits. The railway company also introduced its exhibits or tabulations of the expenses, grouped under the like headings. The accountant of the protestants testified that in making his tabulations he used the line charges for passenger service to the various accounts, shown in the annual report of the railway company, to the commission, and divided these amounts by the line passenger locomotive or line train miles, and multiplied the result by the locomotive miles or train lines in the suburban service. The witness for the railway company testified that he arrived at the results in his tabulations by taking the actual cost in this service for the year 1924, and multiplying by the locomotive miles, or train miles, for the year 1925, in some instances, and used actual figures for the year, in others. The totals of these items of the respective tabulations of expenses of the year 1925, are shown as grouped under their respective heads as follows:

|  | Protestants | Railways |
|---|---|---|
| Acct. 308 — Steam Locomotives—Repairs | $14,269.28 | $23,450.83 |
| " 309 — Steam Locomotives—Depreciation | 2,319.40 | 2,319.40 |
| " 317 — Passenger Train Cars—Repairs | 10,642.87 | 10,265.13 |
| " 318 — Passenger Train Cars—Depreciation | 4,029.97 | 4,029.97 |
| " 373 — Station Employees | 2,799.59 | 2,796.05 |
| " 392 — Train Enginemen | 7,831.46 | 15,749.48 |
| " 394 — Fuel for Train Locomotives | 11,056.53 | 17,869.48 |
| " 397 — Water for Train Locomotives | 869.48 | 922.59 |
| " 398 — Lubricant for Train Locomotives | 314.49 | 327.16 |
| " 399 — Other Supplies for Train Locomotives | 154.16 | 163.58 |
| " 400 — Enginehouse Expenses—Train | 2,207.61 | 3,126.60 |
| " 401 — Trainmen | 7,609.46 | 21,370.09 |
| " 402 — Train Supplies & Expenses | 4,390.54 | 3,793.64 |
| Suburban Service Proportion of Terminal Railroad Association Charges for Maintenance and Operation of Union Station at St. Louis | 24,308.34 | 24,769.75 |
| Total Expenses | $92,803.18 | $130,953.75 |

By reference to the foregoing respective accounts, it is seen that the widest differences exist in three of them, account 308, Steam Locomotives—Repairs, 392, Train Enginemen, and account 401, Trainmen. In arriving at the cost of service charged under many of these accounts, or heads, the accountant for the protestants made a calculation of the cost per mile of that service or charge on the whole system of the company. Thus, in arriving at the cost of train enginemen in the suburban passenger service, he took the entire cost of passenger train enginemen on the whole system, and divided that sum by the total passenger locomotive mileage on the whole system. The quotient represents the cost per mile of that character of service. That cost per mile multiplied by the total locomotive mileage of the suburban passenger service made the sum represented as the total charge or cost for train enginemen in the suburban passenger service. The evidence, however, shows that under the contract between the railway company and the railroad brotherhoods, the men in those employments were paid upon the basis of a minimum trip of 100 miles. As a result the men in this suburban passenger service were not paid upon the basis of actual mileage, but upon the basis of a minimum trip of 100 miles. In view of that fact, the accountant for the protestants conceded that his calculations did not represent the actual charge for engine trainmen and trainmen engaged in this service, but was a calculation or apportionment based upon average cost per mile for such service, which left out of consideration, the fact that these men were paid on the basis of a minimum trip of 100 miles, and not on the actual mileage represented by the suburban passenger service during the year. The commission therefore, as to those charges, accepted the amounts as presented by the railway company. That being so, it would add the sum of $21,678.65 to the total expense, as shown in the exhibit for protestants.

If the amounts in these two accounts, 392 and 401, as shown by the railway company, be substituted for the corresponding amounts shown in the exhibit of the protestants for the year 1925, it would increase the total of expense by the sum of $21,678.65,—that is, the sum of $92,803.18 plus $21,687.65, or a total of $114,481.83. Counsel for protestants, respondents here, urge that the figures furnished by the railway company for the year 1925 were largely statistical, and this is, in a measure, true as to accounts 392 and 401; and they argue that since the proof of the fact lay peculiarly within the knowledge of the railway company, and it chose to submit statistical figures only, it was subject to the rule that the presumption is that the actual figures would be against it, citing Schneider v. Maney, 242 Mo. 36. We have given this question some consideration also. Both parties submitted exhibits showing the corresponding accounts for the year 1924. As an illustration, we take account 401, Trainmen. That account as shown in the exhibit of protestants for the year 1924, was $10,834.05, as compared with $7,609.46 for the year 1925. The same account shown in the exhibit for the railway company for the year 1924, showed $28,265.59, as compared with $21,370.09 shown in the same account for the year 1925. The testimony was that the account for trainmen as given in the exhibit for 1924 was made up from the actual official cards of service. The same account for the year 1925 was not so made, but was made by a calculation based upon the actual cost for 1924 and the service for the year 1925. A consideration of the amounts respectively given for the respective years, shows that the ratio of decrease in the account made by the railway company is practically the same as the ratio of decrease made by the accountant for the protestants. In that view of the matter, we must conclude that the commission was justified in accepting as substantially correct the figures given by the railway company under account 401, Trainmen, for the year 1925. The same might be said of account 392, Train Enginemen. The revenue from the service of the year 1925 was $87,846.95, and the increase in annual revenue to be derived from the increase of rates was estimated to be $12,422.93, resulting in a total of $100,264.88. Upon that basis, the commission held that the cost of service exceeded the revenue. The commission proceeded upon the basis that if nothing was allowed for depreciation, under accounts 309 and 318, and if accounts 392 and 401 as shown by the railway company, were sustained, a total cost of $108,132.46 was shown for the year 1925. There is also considerable difference in account 308, Locomotive Repairs, as shown in the respective exhibits for the year 1925; but, in arriving at its finding of a total cost of $108,132.46, the commission took the amount of that account as given by protestants, and eliminated entirely accounts 309 and 318 for depreciation of locomo-

tives and of cars. It was urged on the hearing before the commission, and here also, that the cars and also the engines in use in this service were old; that no depreciation ought to be allowed on the cars and also that the charge for repairs of locomotives was excessive. But, in allowing the figures of the railway company in accounts 392 and 401, the commission, for the purpose of stating a ground for its conclusion that an expense of $108,132.46 was shown for the year 1925, eliminated entirely accounts 309 and 318 for depreciation, and on the same ground accepted the figures of protestants under account 308, Repairs of Locomotives, and account 394, Fuel for Train Locomotives. There was testimony that the statements of expenses grouped under the various accounts put in evidence, and heretofore set out, did not include numerous expenses which might be apportioned to this service; that the apportionment shown did not include allocation of any expenses for maintenance of way, tracks and structures, superintendence, machine-working equipment, dispatching of trains, stationery, supplies, yard equipment, crossing protection, damage to baggage and injury to persons, and other items of general expense. That the revenue for the year 1925 amounted to no more than the sum of $87,841.95 is not seriously challenged, nor is there any dispute as to the correctness of the estimate that the increase in rates allowed would yield an increase in revenue of $12,422.93. These two added make the sum of $100,264.88. All in all, the evidence in the record sustains the commission in the finding that this suburban passenger service was being furnished at a loss, and also that the estimated increase would not suffice to make it a service yielding any appreciable profit. The trial court erred in its finding that the railway company in this respect failed to sustain the burden of proof imposed upon it.

There was evidence to the effect that the railway company was earning a reasonable profit upon its business as a whole. A carrier has no constitutional right to the same rate or percentage of return on all its business. [Banton v. Belt Line Railway Company, 268 U. S. 413, 421.] But, the fact that upon its business as a whole the railway company was earning a reasonable profit is not of itself a reason for denying an increase in rates for a particular class of service, when it appears that the increase will not suffice to make that service yield any return, or, at the utmost no more than a nominal return over the cost of the service. This is within the principle stated in Northern Pacific Railway Company v. North Dakota, 236 U. S. 585, 595, 596; Norfolk & Western Railway Company v. Conley, 236 U. S. 605, 609; Brooks-Scanlon Co. v. Railroad Commission, 251 U. S. 396, 399; Northern Pacific Railway Co. v. Department Public Works, 268 U. S. 39, 43; Banton v. Belt Line Railway, 268 U. S. 413, 421;

Chicago, Milwaukee & St. P. Railway v. Public Utilities Commission, 274 U. S. 244, 250, 251.

It is urged that the rates as fixed by the new schedule are discriminatory; and, the trial court so found. The protestants introduced in evidence an exhibit setting forth an analysis made by their accountant, of the rates as theretofore in force, and as fixed by the new schedule; and also showing the effect of rates for fifty-ride bearer tickets on the mileage basis, of one and two-tenths cents per mile and of one and three-tenths cents per mile, and of the ten-ride bearer ticket, at one and five-tenths cents per mile. This analysis is as follows:

Protestants' Exhibit F.
Rate Analysis of Frisco Suburban Service at St. Louis, Missouri

| St. Louis to | Mileage | Present 10-Ride Bearer | Rate Per Mile | Sch. 238 10-Ride Bearer | Sch. 238 50-Ride Bearer | Sch. 238 Rate Per Mile |
|---|---|---|---|---|---|---|
| Tower Grove ---------- | 3.3 | | | | | |
| Gratiot ---------------- | 6.7 | .66 | .99 | 1.00 | 5.00 | 1.49 |
| Lindenwood ------------ | 7.1 | .66 | .93 | 1.00 | 5.00 | 1.41 |
| Shrewsbury ------------ | 7.9 | .93 | 1.18 | 1.20 | 6.00 | 1.52 |
| Old Orchard ---------- | 8.7 | 1.19 | 1.37 | 1.40 | 7.00 | 1.61 |
| South Webster -------- | 9.4 | 1.46 | 1.55 | 1.60 | 8.00 | 1.70 |
| Webster Groves -------- | 10.1 | 1.46 | 1.45 | 1.75 | 8.75 | 1.73 |
| Glendale -------------- | 11.0 | 1.46 | 1.33 | 1.75 | 8.75 | 1.59 |
| Oakland --------------- | 11.5 | 1.46 | 1.27 | 1.75 | 8.75 | 1.52 |
| Fair Lawn ------------- | 11.8 | 1.46 | 1.24 | 1.75 | 8.75 | 1.48 |
| Kirkwood ------------- | 12.7 | 1.46 | 1.15 | 1.75 | 8.75 | 1.38 |
| Windsor Springs ------- | 13.2 | 1.46 | 1.11 | 1.75 | 8.75 | 1.33 |
| Meramac Highlands ---- | 14.8 | 1.46 | .99 | 1.75 | 8.75 | 1.18 |
| Keyes-Summit ----------| 16.1 | 1.98 | 1.23 | 1.98 | 9.90 | 1.23 |
| Lake Hill ------------- | 17.2 | 2.45 | 1.42 | 2.45 | 12.22 | 1.42 |
| Valley Park ----------- | 17.9 | 2.64 | 1.47 | 2.64 | 13.20 | 1.47 |

| St. Louis to | Mileage | Present 50-Ride Individual | Rate Per Mile | 50-Ride 1.2 | Rate 1.3 | 10-Ride Rate 1.5 |
|---|---|---|---|---|---|---|
| Tower Grove ---------- | 3.3 | | | | | |
| Gratiot ---------------- | 6.7 | | | 4.02 | 4.36 | 1.00 |
| Lindenwood ------------ | 7.1 | | | 4.26 | 4.61 | 1.06 |
| Shrewsbury ------------ | 7.9 | | | 4.74 | 5.13 | 1.19 |
| Old Orchard ----------- | 8.7 | | | 5.22 | 5.66 | 1.31 |
| South Webster -------- | 9.4 | | | 5.64 | 6.11 | 1.41 |
| Webster Groves ------- | 10.1 | | | 6.06 | 6.57 | 1.52 |
| Glendale -------------- | 11.0 | | | 6.60 | 7.15 | 1.65 |
| Oakland --------------- | 11.5 | | | 6.90 | 7.47 | 1.73 |
| Fair Lawn -------------| 11.8 | | | 7.08 | 7.67 | 1.77 |
| Kirkwood ------------- | 12.7 | | | 7.62 | 8.26 | 1.91 |
| Windsor Springs -------- | 13.2 | | | 7.92 | 8.58 | 1.98 |
| Meramac Highlands ---- | 14.8 | | | 8.88 | 9.62 | 2.22 |
| Keyes-Summit --------- | 16.1 | 8.26 | 1.02 | 9.66 | 10.46 | 2.42 |
| Lake Hill ------------- | 17.2 | 8.26 | .96 | 10.32 | 11.18 | 2.58 |
| Valley Park ----------- | 17.9 | 8.26 | .92 | 10.74 | 11.64 | 2.68 |

The upper table or subdivision shows the same totals respectively, under the new schedule for a ten-ride bearer ticket, or for a fifty-ride bearer ticket, from Webster Groves, a distance of ten and one-

tenth miles, as for Meramac Highlands, a distance of fourteen and eight-tenths miles, resulting in a greater rate per mile for some stations in the group than others, and also a greater rate per mile in some instances, and a less rate per mile in some instances, for some of the stations in that group, than for other stations on either side of the group. The analysis shows the rate for the fifty-ride bearer ticket as five times the rate for the ten-ride bearer ticket, from all stations. In the second subdivision there is contained a statement of the rate for a fifty-ride individual ticket from the stations Keyes-Summit, Lake Hill and Valley Park; and this is contrasted with the rate or amount of a fifty-ride bearer ticket from Webster Groves and other stations within the group mentioned. Related to this difference in rate or amount, is the distinction that one is an individual commutation ticket and the other a bearer commutation ticket. The theory of the protestants appears to be that the rates throughout should have been fixed upon the basis of the mileage strictly, or, closely approximate thereto. Apparently also their theory was that a fifty-ride bearer ticket should be sold at a slightly less mileage rate than the ten-ride bearer ticket. As to this we may state now that in our opinion the difference in the transactions, the printing, sale and use of the one or the other, is not great enough to be the basis for establishing an unjust discrimination. The value of the service to the commuter and the cost of the service to the carrier are not altered by the fact that one is a ten-ride bearer ticket and the other a fifty-ride bearer ticket.

It is settled by the decisions of both State and Federal courts that the mere fact a rate fixed is discriminatory, is not conclusive that such discrimination is unjust, and therefore unlawful and invalid. [State v. M. K. & T. Ry., 262 Mo. 507, 524; Pennsylvania Railroad v. Towers, 126 Md. 59, and same case, 245 U. S. 6; 10 C. J. 665, sec. 1083.] See also McGrew Coal Co. v. Mellon, 315 Mo. 798. In State v. M. K. & T. Ry., supra, this court said, l. c. 525: "Arbitrary discriminations alone are unjust; if the difference in rates be based upon a reasonable and fair difference in conditions which equitably and logically justify a different rate, it is not an unjust discrimination." The principle stated in the foregoing authorities would govern in reference to rates applicable to localities or stations involved is suburban service. The circumstances and relative conditions are to be taken into consideration. [10 C. J. 475, sec. 753.] Mileage is to be considered, but it is not the sole test. The suburban or commutation ticket service is a special service rendered by roads entering large cities and differs in many respects from other passenger traffic. It is a service devoted primarily to those who have their homes in communities adjacent to large cities, but work or carry on their business in the city, and who regularly and daily use that service and are wholesale purchasers of transportation. It

is related also to the fact that such communities often are built up as a result of and in reliance upon such service at mileage rates less than those exacted for ordinary passenger service.

The complaint as to discrimination is essentially based upon the charge of an undue preference of certain localities, or stations, over others. The upper table shows that no increase was made in the rates for the three stations most distant, Keyes-Summit, Lake Hill and Valley Park. The larger increases in mileage rates appear in the stations near the city of St. Louis, reaching the highest point at Webster Groves, the second station in the group, the rate then diminishing to the lowest mileage rate of all at Meramec Highlands, the most distant of the stations forming the group. The arrangement of rates so as to form a group, or a series of groups, necessarily results in a preference in mileage rate, but it is not invalid solely on that account. "The rule both at common law and under the statutes prohibiting unjust discrimination is that common carriers must not unjustly discriminate in favor of the business of one locality or station to the disadvantage of other localities or stations. But neither at common law nor under the statutes, state or federal, is the carrier prohibited from giving a preference or advantage, or from discriminating between localities, provided such preference, advantage, or discrimination is not unreasonable." [10 C. J. 475, sec. 753.] The discrimination forbidden is a discrimination unreasonable, the relative conditions considered, and therefore unjust and unlawful.

The first subdivision of Section 10456, Revised Statutes 1919, in committing to the commission power over rates of common carriers, specifies among other things, rates for commutation tickets, and the power of determination of the question whether such rates are unjust, unreasonable, unjustly discriminatory or unduly preferential.

Section 10457 gives to the commission power to suspend of its own motion or upon complaint, any new rate, fare, charge or classification, and to enter upon a hearing of the question of the reasonableness of such increase; and also that in any hearing involving a rate increase, or a rate sought to be increased, the burden of proof to show that the increased rate or proposed increased rate is just and reasonable, is laid upon the carrier.

Farther on in the act is Section 10535, which provides that in all suits growing out of the exercise of the powers granted to the commission, the burden of proof to show by clear and satisfactory evidence that an order or direction of the commission is unreasonable and unlawful shall be upon the party seeking to set aside such direction or order. [State ex rel. v. Busby, 274 S. W. 1067, 1071; State ex rel. v. Commission, 297 S. W. 47.] Necessarily such adverse party, in a proceeding of review, is confined to the evidence in the record made before the commission, and his function is that of point-

ing out the evidence which shows the order to be unreasonable and unlawful.

The evidence shows that on ten-ride and fifty-ride bearer tickets under the old schedule, the greatest variance in mileage rate was that between the stations Lindenwood and South Webster, a difference of sixty-two hundredths of a cent per mile, and the greatest variation under the new schedule was that between the stations Webster Groves and Meramac Highlands, a variation of fifty-five hundredths of a cent per mile. The new schedule shows an increase in mileage rates for most stations, but the relative difference in mileage rates for most of them is not materially changed. It may be mentioned that under the new schedule there are seven stations or stops constituting the group, or zone, and covering a space of only 4.7 miles in a territory densely populated. This group includes the more important towns within the range of this suburban service, and in some of them more than one stop is made. In stating its conclusion that the service within this group was not unjustly discriminatory, and indeed in a measure, as to all of the service, the commission likened this service with its short intervals between stations and frequent stops, to the service rendered by street railways in cities, and made the further observation, that these communities had grown up under the old schedule carrying a mileage rate differential similar to that proposed by the new schedule; that such differential had been maintained for many years without previous protest. The ground for the conclusion that the fifty-ride individual commutation ticket at the uniform price of $8.25 for Keyes-Summit, Lake Hill and Valley Park, only, was approved by the commission as not unduly discriminatory, upon the ground that this distinction between the individual and the bearer ticket had been drawn for many years without previous protests, and also on the further ground, that the volume of traffic was not such as would unduly burden that service, and that a slight saving to the consumer might induce more people to move to that outlying district, and by its use of those trains, benefit the whole suburban service. A great and progressive falling off in the traffic was shown by the evidence, and this was mainly due, as the evidence indicated, to the great growth of transportation by motor vehicles, private and public.

In view of all the foregoing, we have reached the conclusion that sufficient grounds do not appear to warrant us in finding that the commission was wrong in holding that the rates are excessive, or unjustly discriminatory, and the judgment of the circuit court is therefore reversed. *Seddon* and *Ellison, CC.*, concur.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur.