## LOGAN CITY v. PUBLIC UTILITIES COMMISSION OF UTAH

No. 4889. Decided March 17, 1931. (296 P. 1006.)

*Leon Fonnesbeck,* of Logan, for plaintiff.

*Geo. P. Parker,* Atty. Gen., and *Van Cott, Riter & Farnsworth,* of Salt Lake City, for defendant.

FOLLAND, J.

This is an original proceeding by Logan City, a municipal corporation of Utah, hereinafter called the city, against the Public Utilities Commission of Utah, hereinafter called the commission, and the Mountain States Telephone & Telegraph

Company, hereinafter call the company, to review an order of the commission authorizing a new and higher schedule of rates for telephone service in the Logan exchange.

The company on November 14, 1927, filed with the commission its petition for an increase in rates, alleging that the rates then in effect failed to yield a fair and reasonable return on the value of its property used and usable in telephone service in the Logan exchange. The city filed a petition in intervention protesting and objecting to any increase in rates. After a hearing the commission made and filed its report and order authorizing the company to put into effect the proposed higher rates effective April 1, 1929. In its report the commission found that the total value, for rate-making purposes as of December 31, 1926, of the Logan exchange was $295,548.42, that for the year 1926, net results of operation show a return of 2.37 per cent on the average value of the property, and that the annual rate of return, after granting the rates prayed for, would be 4.86 per cent. The valuation found was based on the valuation as of August 31, 1919, as fixed by the commission in a former case wherein the valuation of all the properties of the applicant within the state of Utah was determined, together with additions and betterments shown to have been made since that date. The average annual rate of return for the five-year period ending with and including the year 1927 was shown to be 1.11 per cent, the year 1926 having the highest rate of return during such five-year period.

Plaintiff has alleged several specific objections to the report and order of the commission. These will be discussed in the order presented.

The first objection is that the commission failed to make any finding with respect to the allegation that the company is bound by the schedule of rates set out in the franchise ordinance of the city, which rates are lower than the schedule of rates approved by the commission. Plaintiff concedes that the commission has authority under the statutes of the state and decisions of this court to set

aside franchise or contract rates, but contends that this may be done only upon and after a specific finding that such rates are unreasonable, and that the commission has no power to vacate franchise or contract rates if such rates are in fact fair and reasonable. The franchise from Logan City under which the company is operating provided for the charging of certain specified rates for the different classes of service, with provision for other and higher rates after the city had attained a population of 10,000 and until its population had reached 50,000. The franchise also contained the provision that "in the event a public utility commission or similar body is created by law within the State of Utah, then the force and effect of this section shall yield to the rulings of said utility commission, or other body, to the extent of the powers vested by law in such utility commission or other body to regulate the rates of the grantee."

The United States government, as a war measure, took over all the telephone properties of the company July 31, 1918, and operated them until July 31, 1919, when they were returned to the company. While in government control all telephone rates throughout the United States were increased by order of the Postmaster General. The rates in effect in Logan City fixed by the franchise were substantially increased by this order. After the telephone system was returned to the company by the government, the commission, on application made by the company, in case No. 206, made an order continuing in force the same rates as had been fixed by the Postmaster General. The commission thus exercised jurisdiction over the rates charged by the company at Logan and authorized an increase over what had been specified in the franchise. This was a ruling regulating rates within the proviso in the franchise above quoted. The commission in the present case did not change rates fixed by franchise, for these had already been superseded by the rates established in case No. 206. The franchise rates having been terminated by the exercise of jurisdiction and order of the commission in the former case, no finding or order with re-

spect to the franchise rates was necessary in this case. *Denny* v. *Pacific T. & T.*, 276 U. S. 97, 48 S. Ct. 223, 72 L. Ed. 483; *Railroad Comm.* v. *Los Angeles Ry. Corp.*, 280 U. S. 145, 50 S. Ct. 71, 74 L. Ed. 234.

Plaintiff complains that the commission failed to make a finding on the issue presented by its petition on the matter of poles owned and maintained jointly by the company and the city.

Upon renewal of the franchise in 1915, by contract between the city and the company, it was agreed that the poles owned by the city and used by it as a part of its electric system, and the poles of the company used by it in its telephone system, all located in the streets of the city, should be jointly used, owned, and maintained by them. The company is under obligation by virtue of this contract to bear half the cost of maintenance of these poles, whether it uses them or not, until 1935. There are now 1,386 poles in the streets of the city jointly owned. The company within the last five or six years changed its policy and adopted what is called the interior block system. That is, the poles and wires are located inside the block, and houses are connected with wires from poles in the back yards or alleys instead of from poles in the street. Six hundred thirty-five of the jointly owned poles have been abandoned by the company, and it is the intention of the company to further extend the interior block system from time to time as convenient or necessary, which will result in the abandonment of its use of all the jointly owned street poles.

In its report the commission said:

"With reference to jointly owned poles, the commission is of the opinion, and so ruled at the hearing, that inasmuch as neither the applicant nor Logan City is asking relief from the contract governing the jointly owned poles the subject is not material in this case."

The city contended that the change to the interior block system imposed an additional and unnecessary burden upon

the rate payer in increased cost of plant, expenses of maintenance, and amount necessary to be set up for depreciation. The amount involved in this change was not large enough to materially affect the rates. The location and manner of placing the poles for the distributing system is essentially a matter of business management of the utility which should not be interfered with by the commission unless it is made to appear that the policy and consequent expenditure is actuated by bad faith, or involves dishonesty, wastefulness, or gross inefficiency. There is nothing of this kind either alleged in the petition or disclosed in the record. The management apparently proceeded in good faith and believed the interior block system was best suited to serve its purposes. Whether this method of bettering its system was most economical or efficient was a matter within the sound discretion of the management. It is well settled that public commissions cannot, under guise of rate regulation, take into their hands the management of utility properties or unreasonably interfere with the right of the management. *Monroe Gaslight & Fuel Co.* v. *Michigan Public Utilities Comm.* (D. C.) 11 F. (2d) 319; *State Public Utilities Comm.* v. *Springfield Gas & Elec. Co.*, 291 Ill. 209, 125 N. E. 891; *Pacific Tel. & Tel. Co.* v. *Whitcomb* (D. C.) 12 F. (2d) 279, affirmed in 276 U. S. 97, 48 S. Ct. 223, 72 L. Ed. 483.

It is next contended that the commission failed to make proper findings on issues presented as to the rural lines attached to the Logan Exchange. The commission's finding was as follows:

"The protestant's claim that the Logan Exchange has an unduly large number of rural lines, and that it would be better and more fair to all exchanges if said rural lines should, for rate-making purposes be considered as part of the entire telephone system of the applicant in this State; that the larger centers in the State served by the applicant are directly and materially benefited by the rural lines by broadening the field and thereby increasing the usefulness of the applicant's telephone service in general, and that the rural lines do not pay, and should, therefore, at least partially, be carried by the central exchanges, is not without some merit. The rural lines are, however,

an indispensable part of the exchange in which they center, and must be taken into account in fixing valuations and rates applicable to the city exchanges and the thickly populated centers that are benefited by telephone connections."

The position of plaintiff is fairly reflected in this statement of the commission. While plaintiff argued that the Logan exchange was overburdened with rural lines, the manager of the company testified that several exchanges in the state had a greater mileage of rural lines than this one. The evidence fairly shows that this exchange is not unduly burdened by rural lines, and any finding which the commission might have made in that respect could only be in support of the decision. Moreover, the conclusion reached and announced by the commission on this particular subject is entirely sound and proper. The territory served by the rural lines is tributary to Logan as the commercial center. Their value to the business men of Logan is indicated by the fact that Logan people petitioned to have certain of these rural lines attached to that exchange and would undoubtedly protest if such lines were severed therefrom. Ordinarily the definition of an exchange area and determination of what rural lines shall be attached to a certain exchange are matters of business management and will not be interfered with by the commission in the absence of allegation and proof of bad faith or imprudence. There was no such showing here.

The city further complains that the commission failed to make a finding that the Logan exchange was paying, under the old rates, a higher percentage of return on property invested than any other comparable exchange in the state. Comparison was sought to be made with the Provo exchange, since Provo is the one city in the state with a population somewhat comparable with that of Logan. The schedule of rates in effect on the Provo exchange was not introduced in evidence, but because the percentage of return upon plant investment at Provo was less than that at Logan, counsel argue that it was not only im-

proper but unlawful under Comp. Laws Utah 1917, § 4789, for the commission to authorize an increase in the Logan rates. This section prohibits a utility from establishing or maintaining discriminatory or preferential rates or charges, or any unreasonable difference as to rates, charges, or service as between localities or classes of service. No point is made that there is a difference or discrimination between the two exchanges as to rates, charges, or service, but merely that the rate of return on investment is less from the one than from the other. Under Comp. Laws Utah 1917, § 4800, subd. 2, the commission is empowered to investigate a single rate, or any number thereof, or the entire schedule of rates. It is not the law that the commission may not act upon one rate, or the schedule at one exchange, without at the same time acting upon all or any other rates within the state. Nor is it the law that the commission must require the company to maintain confiscatory rates at one exchange merely because it is doing business at another exchange at confiscatory rates. The rate of return from the Logan exchange for 1926 was found to be 2.37 per cent, while the evidence disclosed that the rate of return from the Provo exchange was less than 1 per cent. Both rates are so low as to justify relief in a proper case. The ultimate fact found by the commission was that the rate of return from the Logan exchange was 2.37 per cent. This is in effect a finding that the rates were unreasonable and inadequate. The commission has not indicated what percentage of return is reasonable and adequate, but the cases hold, without exception, that rates yielding so low a rate of return as here are not adequate or reasonable. It is well settled that each rate should be compensatory, and that a utility cannot be required to perform service at a rate which is confiscatory. *Smyth* v. *Ames,* 169 U. S. 466, 18 S. Ct. 418 L. Ed. 819; *State* v. *Public Service Comm.,* 321 Mo. 297, 10 S. W. (2d) 946. It is also recognized that it is impossible to construe a rate structure so that the rate of return will be uniform on all rates, and that neither the utility nor the customer has the right to insist

upon uniformity of the rate of return. *Banton* v. *Belt Line Ry. Corp.*, 268 U. S. 413, 45 S. Ct. 534, 69 L. Ed. 1020. It was wholly unnecessary that the commission make any finding as to whether or not other exchanges in the state would yield a lower rate of return. A comparison of other rates would be persuasive or controlling only where shown that conditions were comparable and that the rates used for comparison were just and reasonable rates. *State* v. *Southwestern Bell Tel. Co.*, 115 Kan. 236, 223 P. 771.

Counsel for plaintiff concede that the company is entitled to earn a reasonable return on its investment. They say that 8 per cent is not a reasonable rate of return, but that 5 per cent is such reasonable rate. The commission was not called upon in this case to fix a definite rate as the reasonable rate of return which the company would be entitled to earn upon its investment, and consequently it did not determine what a reasonable rate of return would be. It has nowhere fixed that rate at 8 per cent. By authorizing the new rates, the commission found that these should produce a return of 4.86 per cent on the value of property in the Logan exchange, and in so doing has concluded that such a rate is not excessive. Since the city has conceded a 5 per cent return to be fair and reasonable, we need not further consider this question.

Counsel for the city call attention to the fact that they are not equipped with the necessary expert assistance to adequately investigate and check the valuations and accounts set up by the company; that they were unable to go into the books of the company in such a thorough manner as to be wholly satisfactory. They say:

"We believe the Commission was created to protect the public from excessive charges and we direct this court's attention, to the specific sections of the Public Utilities Act which strongly guard and protect the public against a raise in rates. The duty to cause a check and revaluation of the property of a public utility, if the same is necessary does not reside with a member of the public who comes in and protests against a raise in rates. That duty and power is placed by statute with the Commission."

Though we might sympathize with this point of view, this court can be of no assistance in the matter. That argument should be addressed to the Legislature, with the request for additional funds for use by the commission if necessity exists for a greater or more detailed service with respect to financial and valuation reports, or the making of independent valuations, than the commission is now able to give with its limited staff and resources. No complaint is made that the commission did not do all that it could do in the instant case. Indeed, its accountant was placed at the disposal of plaintiff and assisted its investigators and counsel in every way possible. No complaint is made against the attitude of the company or its officials. They were said to be most courteous and gave every assistance to representatives of the city and the commission, and furnished all information called for and available. It is merely said that the task was so great that the city, with the means at its command, was unable to make an adequate check on the evidence submitted by the company.

The defendant filed and argued a motion to strike the abstract furnished by plaintiff upon the grounds that no abstract is required by rule of court or by the statute, and particularly that the abstract filed is insufficient to properly and adequately present the evidence adduced before the commission. It is true an abstract is not, in original proceedings such as this, required by law or rule of court. An abstract, however, when fairly presenting the evidence, is a great convenience to the court in its study of the case and preparation of the decision, and is also essential to properly perpetuate the record in this court. Since the cost of printing the abstract will not be imposed upon the defendant, we need not consider whether the abstract here filed is adequate or not. This motion is denied.

The report and order of the commission are affirmed, with costs to defendants.

CHERRY, C. J., and ELIAS HANSEN, and EPHRAIM HANSON, JJ., concur.

STRAUP, J. (concurring).

I concur in the result. I would have been better satisfied had the commission made more complete findings on the issues. The statute, Comp. Laws of Utah 1917, § 4834, I think, contemplates that the commission shall make findings of ultimate facts. The section further provides that the findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review and that a review by this court shall not extend further than "to determine whether the commission regularly pursued its-authority, including a determination of whether the order or decision" violated any right under either the state or federal constitution. Section 4830 forbids the commission from raising any rate or charge, etc., or altering any contract, etc., "except upon a showing before the commission. and a finding by the commission that such increase is justified." Subdivision 1.

The telephone company asked an increase of rates or charges for a business individual line in Logan City from $60 to $72 per annum; a business two-party line from $48 to $60 per annum; a residence individual line from $30 to $36 per annum; a residence two-party line from $27 to $30 per annum; and a residence four-party line from $24 to $24 per annum. This was put on the alleged ground that subscriber stations in Logan numbering 1,405 in December, 1915, increased to 2,141 subscriber stations in 1926, which resulted in a consequent increase in the investment plant, in carrying increased charges and expenses from August, 1919, to December, 1926, and of an added exchange plant at a cost of $44,640, and as the subscriber stations increased, the exchange plant became "more complex," requiring larger poles and longer aerial cables; that the revenues derived from operation in 1926 were not sufficient to pay an annual return of 8 per cent "on the average value of the property" for that year, and left a deficit in such respect of about $16,000; and that "taking 1913 values as a basis, telephone service in Logan has increased in cost to consumers less than

20 per cent as compared to an increase in the cost of living of approximately 78 per cent."

The material allegations were denied by Logan City. It further alleged that the maximum rates which could be charged were fixed by the franchise granted by the city to the telephone company and that the demanded increase of rates was not in accordance therewith and was excessive and that Logan City exchange was already paying a higher rate or percentage of return considering the value of the property invested than any other exchange in the state; that the Logan exchange had an unduly large share of rural lines which were not revenue producing and which were operated and maintained by the company as a part of its telephone system in the state, and that it was unfair and unreasonable to increase the rate of patrons using phones in Logan City to meet deficits in the operation of the rural lines, and that the increase of rates in the city was discriminatory and unreasonable; that whatever cost or expense was incurred from 1919 to 1926 in enlarging the Logan exchange plant was incurred by extensions of lines and service in rural districts and by abandoning pole lines in violation of an agreement between the city and the company to be used and maintained in common by the city and the company.

Complaint is made that all of the material issues were not disposed of by the findings. Were this a law action tried to a court, I think it well could be said that all of the material issues were not disposed of by the findings and that a judgment based upon them rested on insufficient findings. But the question is: Does the same rule as to findings in such an action apply to proceedings before the commission? I doubt that. While findings of some sort are required, yet I doubt that they are required to be as complete as in a law action tried to a court.

No finding is made as to the pleaded franchise fixing a maximum rate or charge. If on a prior hearing in another proceeding between the same parties the franchise as to rates was involved and a ruling made on the subject adverse

to the city, the commission could have so found. That would have disposed of the issue. But the question is presented and argued here as though it still was at large. Nevertheless no finding is made that any such determination or adjudication was made or that the rate as fixed by the franchise is discriminatory, or is or has become unreasonable, or that it for any other reason is no longer of binding effect. Nothing is said about it.

The commission found that the value of the company's physical property at the Logan exchange in 1919, eight or nine years prior to this hearing, was $205,336; that since that time additions and betterments have been added of the value of $44,640; that in 1919 the commission established "a basis for Interest During Construction, Going Value and Working Capital" and "applying such basis to the physical value at Logan" made an additional value of $45,571, or a total valuation of physical property at Logan City of $295,-548 for rate-making purposes, and on that basis the operation at Logan City for 1926 showed a return of only 2.37 per cent of the average value of such property; and that if the rates prayed for were granted, the annual return would be only 4.86 per cent. It appears that for rate-making purposes the value of the physical property of the company at Logan City was considered as of a valuation made in 1919 instead of a valuation at the time of the hearing, and upon the further consideration, as alleged by the company and as found by the commission, "that since 1913 and taking 1913 values as a basis, telephone service in Logan has increased in cost to the consumers less than 20 per cent, as compared to an increase in the cost of living of 78 per cent." It is common knowledge that during the war and for several years thereafter, values of all kinds of property, real and personal, including all kinds of material and products, etc., were highly inflated, and cost of living greatly increased; but of recent years have been and now are greatly deflated and lessened. The findings, which are set forth in the prevailing opinion, as to the "jointly owned poles," in view of

the issue presented in such respect and as heretofore indicated, and the findings with respect to the claim of the protestant that the rural lines for rate-making purposes should be considered as a part of the entire telephone system rather than as a part of the Logan exchange, constitute no findings of facts or of conditions upon which a conclusion one way or the other may be deduced with respect to such issues.

Thus, it may well be doubted whether the findings as made are sufficient to support the order. The sufficiency of them is challenged. But until some rule or decision of this court is announced as to how full or complete findings of the commission should be, whether as full as in a law action which to uphold a judgment all of the material issues must be disposed of by findings or whether findings of less completeness suffice, final orders of the commission should not be disturbed because it may be thought the findings are not as full or complete as they should be, unless it appears that the order was based on wrong or misconceived or misapplied principles of law, or that the order is against or is not sufficiently supported by evidence. Leaving the findings and going into the record evidence transmitted to us, I am not prepared to say that the order is not sufficiently supported by the evidence.

I therefore on the record evidence concur in the affirmance of the order.