This is an appeal from the judgment of the Circuit Court of Cole County affirming an order of the Public Service Commission. Appellant made application to the Public Service Commission to purchase 3,330 voting trust certificates of the Laclede Power and Light Company at $214.06 each, a total of $712,817.27, and stated in the application as reasons therefor:
"That the City of St. Louis is now being served with electrical energy by Union Electric Light and Power Company, petitioner herein, and said Laclede Power Light Company, the only electrical utility corporations operating in said City, and it is in the public interest that petitioner be permitted to acquire said voting trust certificates for the reason that such acquisition will bring about closer cooperation between said utility corporations, and thus make it possible to improve the economic utilization of electrical energy produced and distributed by them in said City."
The owners of the certificates from whom application to purchase was made and the amounts to be paid to each was shown to be as follows:
 No. of Purchase "Names of Sellers Certificates Price Securities Investing Trust ............ 2440 $518,389.57 North American Edison Company ......... 850 180,586.56 Edison Securities Corp. ............... 40 13,641.14 ____ ___________ Total ................... 3330 $712,817.27"
These certificates represented approximately twenty-six per cent of the capital stock of the Laclede Company, its total outstanding shares being 13,183 of which 245 shares were held by individual owners. There remained 9,603 shares (all except five directors' qualifying shares) which were owned by a holding company, the Utilities Power Light Corporation. The Laclede Company owned an electrical distribution system operating chiefly in the business district of the city of St. Louis. The holding company which controlled it also controlled the Laclede Gas Light Company, which furnishes gas in St. Louis. Appellant is a competitor of the Laclede Company in the distribution of electricity in St. Louis and was also in the gas business. It, also, is controlled by a holding company, all of its common stock being *Page 430 
owned by the North American Edison Company. All of the common stock of the North American Edison Company is owned by the North American Company, which likewise controls the Edison Securities Corporation. The Securities Investing Trust, which owns the greater part of the shares of the Laclede Company which appellant seeks permission to purchase, was formed for the express purpose of acquiring these shares by Frank L. Dame, president of the North American Company, chairman of the board of the North American Edison Company, vice-president of the appellant company, and a director in all three companies, together with Edwin Gruhl, vice-president and general manager of the North American Company, president of the North American Edison Company and director in both of these companies, as well as appellant company. While they are the real owners of this trust, it is composed of three trustees acting under declaration of trust made pursuant to the laws of Massachusetts. These various interests were called the "North American family" by Mr. Egan, appellant's president, who was also a director of the North American Edison Company. He testified that the manner of acquisition of the Laclede stock by the prospective sellers was as follows:
"The stock was acquired some four years ago. This stock was held in friendly hands and accumulated with the idea that eventually it might be sold to Union Electric Light and Power Company, I was partly responsible for the purchase of it by the present owners. I suggested that it might be purchased. My suggestion was to the president and to the vice-president and general manager of the North American Company. The suggestion came about the time when they began the purchases. I directed the purchase of part of it. My purchases were for The North American Company. I purchased about 700 shares. It was paid for by checks of Union Electric Light and Power Company, made payable to my order, and endorsed by me to G.H. Walker Company. Payment was by checks. . . .
"No shares were purchased by Union Electric except as agent. Union Electric then issued its check, which, in turn, was promptly refunded by The North American Company. . . .
"It should be purchased by Union Electric because that was the intention when it was purchased. . . . I said the average purchase price was $163. It may be more than that. However, I am prepared to say that it represents the actual cost plus interest only. . . . The difference between the $163, or whatever it is, and the price now being paid represents nothing more accruing to these three vendors than the carrying charge of six per cent, or some figure near that, over the period during which the stock was held by them; no other profit whatever."
He also testified further concerning the reasons appellant desired to complete the purchase, as follows: *Page 431 
"That Union Electric Light and Power Company is the result of a consolidation of many electric light and power companies which formerly operated in the company's territory. In addition to being a generating and operating company, the company is also an investment company to the extent that it holds large amounts of stock of various companies such as the East St. Louis and Suburban Company, Union Electric Light and Power Company of Illinois, Alton Light and Power Company, Mississippi River Power Company, Central Mississippi Valley Electric Properties and others. There are no public utilities operating in this territory to whom applicant does not sell current wholesale with the exception of one, and that is Laclede Company. No argument is required to support the wisdom of unification of electric supply in a territory. The economics have been affirmed and established and reestablished again and again. Therefore, we are looking forward to the time when we will be unanimous in our territory and this is the only place where that condition does not hold now. . . .
"It is our purpose to buy the remaining stock of this company, or at least enough to give us control, with the idea of consolidating that with the companies we own. . . .
"There probably is no benefit to the public from this purchase other than as an entering wedge to obtaining control of Laclede Power Light Company. It certainly would not be detrimental to the public interest for us to acquire the stock. I think it would be decidedly in the public interest. If it were other than a first step toward the acquisition of Laclede Power Light Company, it probably would not be in the public interest. . . .
"Through its ownership of the 3,330 voting trust certificates I think Union Electric will be able to elect a director on Laclede's board. It has five directors."
The evidence also showed that qualifying stock had been already transferred to the name of the president of appellant company and that he would probably be elected to the board of directors of the Laclede Company if the appellant's application was granted. It was further shown that there was considerable competition between the Laclede Company and appellant company; that appellant's president thought the methods of competition of the Laclede Company unfair; that perhaps ninety-five per cent of the new electrical business taken by the Laclede Company was taken over from the appellant company; that appellant company had at one time subsidized an employee of the Laclede Company in order to have him refuse new business (the present president of appellant company, however, said he had discharged the employee who had done the subsidizing); and that the Laclede Company had reduced its rates every time appellant company had reduced its rates. It was also shown that the Laclede Company had not paid dividends on its stock, although it had earned an *Page 432 
average of $14 per share each year for the last four years, but that it had used these profits to build up and extend its properties, and that during that period the value of its property and plant had increased from $421,000 to $2,392,000. Appellant is a much larger corporation than the Laclede Company.
The city of St. Louis and the Laclede Company both opposed appellant's application and the Commission refused it, stating its conclusions as follows:
"The two corporations involved in this proceeding are engaged in bitter competition, as abundantly appears both from the record before us and from other cases pending and decided by the Commission. The effect of the proposed transfer will be to enable the Union Company to place one of its directors upon the board of directors of the Laclede Company, and its intention so to do appears in the record. The question that at once presents itself is whether the public interest is concerned. . . .
"Furthermore, the individual so selected may be — and, as this record discloses, probably will be — both an executive officer and a member of the board of directors of the Union Company. He will then be placed in the anomalous and, to the law, insufferable position of owing high allegiance and fidelity to each of two hostile interests. . . .
"There is no doubt in our minds that the harmonious and efficient conduct of the business of both corporations here in question would be hampered and impaired by the intrusion into the board of directors of the Laclede Company of the director acting in the interest of its rival. We believe that the inefficiency and disorder which might thus be occasioned might also be reflected to a greater or less extent in the rates and service rendered by the two companies. We believe, therefore, that the public interest will be affected adversely by our approval of the transfer of the stock in question under the circumstances of this case, and that the application should be denied."
Appellant's contention here is that the Commission's order refusing its application to purchase the stock is unlawful, unreasonable, arbitrary and an abuse of its discretion because not based upon any evidence. Specifically it contends that there is no evidence to support the finding of the Commission that granting its application would be detrimental to the public interest and welfare. There is much discussion in the briefs concerning the proposition of whether it must affirmatively appear that the public will be benefited by such a purchase before the Commission is authorized to grant it or whether it need only be shown that it will not be detrimental to the public interest (see State ex rel. City of St. Louis v. Public Service Comm., 331 Mo. 1098, 56 S.W.2d 398); and also as to whether or not appellant has indirectly purchased the stock in question and thereby *Page 433 
violated Section 5195, Revised Statutes 1929, and for that reason is not entitled to have the Commission validate such a violation of the statute by granting permission now to legalize an illegal act. However, we do not need to discuss these questions here because the Commission did not base its order upon these grounds, but upon the ground that granting the application "would work positive and direct detriment to the public interest and for that reason should be refused." Appellant's brief states:
[1] "Appellant's chief ground of complaint is that there is noevidence in the record from which it can be inferred that the acquisition of the stock by Union Electric, and its subsequent election of Mr. Egan as a member of Laclede's board of directors, would result in harassing or annoying Laclede and this proving detrimental to the public."
We will therefore confine ourselves to a consideration of that question which we think is decisive of the case. We have quoted very fully from Mr. Egan's testimony. We think the Commission was justified in refusing this application in the situation disclosed thereby. It is clear that appellant's theory is that absolute monopoly in the whole territory in which it operates is best for the public interest because it is more efficient and economical. That might be true, particularly in a sparsely settled area, but whether it is true in a great metropolitan center like the city of St. Louis is another matter. It also might be better from the standpoint of profits for the North American family, but whether it would, under the situation now existing be better for the people of the city is, likewise, another matter. But these are questions for the Commission to decide. In deciding them, the Commission must take into consideration not only the interests and economic theories of the so-called North American family, but also the interests of the families and industries of the city to be served, under the practical conditions as they actually exist. Theoretically, an absolute monarchy is the most efficient and economical form of government. As a practical matter, however, the lessons of history show that human nature is not strong enough to continuously withstand the strain of the temptations which come with absolute power. While the purpose of the Public Service Commission Act is to restrain cut-throat competition upon the theory that it is destructive, and that the ultimate result is that the public must pay for that destruction, and while regulation can provide for both adequate service, reasonable cost to consumers and reasonable return to companies, we do not conceive it to be the purpose of the regulatory policy of this State to eventually place each form of public utility service throughout the whole State under the control of only one corporation. That is where appellants' theory of the public welfare could logically lead. While that may come in the future, it cannot be found in the present act. Article IV, of Chapter 33, Revised Statutes *Page 434 
1929, contemplates the probability and even expectation that more than one power and light company will engage in business in the same area and even in the same municipality. Moreover, municipal ownership of such utilities is still provided for and we have held that they do not even come within the regulation of the act. [City of Columbia v. Public Service Comm., 329 Mo. 38,43 S.W.2d 813.]
We do not mean to imply that a regulated monopoly, in any territory (rural or urban) where adequate service is furnished, is not contemplated by the act. We think it is, when the circumstances show that better service will be rendered thereby to the public than by competition. We have many times upheld the orders of the Commission refusing to permit competition under such circumstances. [See State ex rel. Alton Transportation Co. v. Public Service Comm., 330 Mo. 1, 49 S.W.2d 614, and cases cited; State ex rel. Missouri Pacific Railroad Co. v. Public Service Comm., 327 Mo. 249, 37 S.W.2d 576; see, also, State ex inf. Barker v. Kansas City Gas Co., 254 Mo. 515, 163 S.W. 854.] But may not regulated competition, under such circumstances as are disclosed here, still serve a useful purpose, under the circumstances disclosed here? Even though two power corporations may operate on the same schedule of rates, they may compete with each other in such matters as the character of service they render, the courtesy and efficiency of their employees in doing it, the modernization of their equipment and the economy of their operation, all of which are matters of some importance to consumers. We have not reached the place where such improvements in equipment and methods of operation and service cannot be further perfected. Self-interest in obtaining business and making profits is still, and apparently will continue to be, the greatest incentive in bringing about such advancements. With more than one company in the field, the Commission is afforded the opportunity for comparison as to equipment, methods and practices which is a helpful basis for its rate making and other regulatory activities. The commission might reasonably oppose the proposed acquisition of the Laclede Company by appellant on these grounds as long as the people of St. Louis continue to receive satisfactory service from the two companies.
[2] However, even though the Commission might be of the opinion that it would eventually be to the public interest to have only one power company operate throughout the city of St. Louis, still, it would be justified, from the evidence in this record, in deciding that it was detrimental to the public interest to attempt to bring it about in the way in which appellant here proposes. In determining the sufficiency of evidence to support a judgment, we consider not only all actual facts directly shown but also all the reasonable inferences which may properly be drawn from the facts shown. Innumerable authorities on this proposition may be found in Volume 27, Missouri *Page 435 
Digest, pages 176-182 (on demurrer to the evidence) 12 Mo. Dig. 555; 23 C.J. 54, sec. 1797; 10 R.C.L. 1007, sec. 196. Numerous enlightening facts appear here. The North American family has some three-quarters of a million dollars tied up in Laclede shares upon which it is receiving no dividends. The profits of the Laclede Company are being used to build a distribution system paralleling that of appellant which is not in accord with the economic theory of appellant's officers nor their intention to acquire and consolidate it with their own. Almost three-fourths of the stock of the Laclede Company is owned by a single owner. Purchase of this stock would transfer control now, but no negotiations whatever have been had for the acquisition of this stock. Transfer of the twenty-six per cent sought to be acquired will not give appellant any more actual control than it now has, although it might legalize what it is attempting to do. Appellant's president said that this purchase would be "an entering wedge to obtain control of Laclede Power Light Company." We think the Commission might be justified in considering this simile as indeed very apt. We understand a wedge to be an implement for splitting some other thing wide open. It was for the Commission to determine whether granting appellant the opportunity to get ultimate control by that method would be in the public interest. Appellant's avowed purpose of placing upon the board of directors of the Laclede Company, with the idea of eventually owning it, the president of its bitter competitor, the appellant company, where he would be in its rivals innermost councils and in a position to obtain its confidential information and business secrets, would create a situation from which we think the inference would be justified that the future relations of the two companies would be far from harmonious and helpful. It recalls the ancient precept (which is still good authority both as precedent and upon reason) that "where your treasure is, there will your heart be also;" that "no man can serve two masters," and that under such circumstances "he will hold to the one, and despite the other." [See St. Matthew, 6 Ch. 21-24.] It should under the circumstances here, require no prophet to foretell where the allegiance of appellant's president would necessarily be.
[3] It appears from the records of this court, of which we may take judicial notice (State ex rel. Ponath v. Hamilton (Mo.), 240 S.W. 445; Custer v. Kroeger, 313 Mo. 130, 280 S.W. 1035, 44 A.L.R. 1328; Bushman v. Barlow, 321 Mo. 1052, 15 S.W.2d 329; Kinnerk v. Smith, 328 Mo. 513, 41 S.W.2d 381) that an attempt on the part of the industrial giants constituting the North American family to place Mr. Egan on the board of directors of the Laclede Company has already resulted in litigation. Where there has been such long and bitter rivalry as has continued between these companies, is it not a matter within common knowledge and experience that if a leader of one such rival camp forces himself into the councils *Page 436 
of the enemy, against their will and with the purpose of acquiring their property, the result will not be peaceful, helpful and harmonious cooperation? Upon similar subjects this court has said: "`There is no reason why courts should pretend to be more ignorant than the rest of mankind;'" that "`courts ought not to proceed on the theory that they do not know what every one else does know;'" and that it should be unnecessary to "require a solemn allegation or proof that fishes swim or that birds fly." [State v. Missouri Pacific Ry. Co., 212 Mo. 658, 111 S.W. 500; 23 C.J. 149, sec. 1970.] At any rate, if the consequences of such action are not a matter for judicial notice, they are plainly inferable from the facts and circumstances disclosed. All of this, however, merely goes to the question of whether or not the order of the Commission was unlawful and unreasonable, considering the announced and disclosed methods and purposes of the North American family as to its acquisition of the stock of the Laclede Company, in refusing appellant company operating under its jurisdiction the permission it sought to become the legal owner of that part of its competitor's capital stock under the circumstances existing here. The legal principles upon which this question must be ruled have been often stated.
"The only question for the circuit court on the writ of review, and by this court on appeal, is whether the orders made by the Commission subserve the public welfare in a manner and to an extent reasonable and lawful, and this question is to be solved regardless of contract rights or obligations, except as such enter into the reasonableness or lawfulness of the orders made. [City of St. Louis v. Public Service Commission, 276 Mo. 509, 526, 207 S.W. 799.]" [State ex rel. City of Kirkwood v. Public Service Commission of Mo., 330 Mo. 507, 50 S.W.2d 114; see, also, Sec. 5234, R.S. 1929, Mo. St. Ann. sec. 5234.]
"`To justify a reversal of an order of the Commission falling within its discretionary power on the ground that such order is unreasonable, it must appear that the action of the Commission was arbitrary or without reasonable basis.' [State ex rel. Alton Transportation Co. v. Public Serv. Comm., 330 Mo. 1, 49 S.W.2d 614, 617.] Under Section 5247, Revised Statutes 1929 (Mo. St. Ann. sec. 5247), the burden of showing that the commission's order is unreasonable or unlawful is upon appellant." [State ex rel. St. L.S.F. Ry. Co. v. Public Service Comm., 331 Mo. 438,53 S.W.2d 868; see, also, Chicago, B. Q. Railroad Co. v. Public Service Comm., 266 Mo. 333, 341, 181 S.W. 61; State ex rel. Wabash Railroad Co. v. Public Service Comm., 271 Mo. 155, 196 S.W. 369; State ex rel. Harrisonville v. Public Service Comm.,291 Mo. 432, 236 S.W. 852; State ex rel. City of St. Joseph v. Busby (Mo.), 274 S.W. 1067; State ex rel. Pugh v. Public Service Comm., 321 Mo. 297, 10 S.W.2d 946; *Page 437 
State ex rel. Detroit-Chicago Motor Bus Co. v. Public Service Comm., 324 Mo. 270, 23 S.W.2d 115.]
Our conclusion is that appellant has not sustained the burden of showing that the order of the Commission is unreasonable or unlawful.
The judgment is affirmed. Ferguson and Sturgis, CC.,
concur.