STATE OF MISSOURI at the Relation of the CITY OF SIKESTON, Appellant, v. PUBLIC SERVICE COMMISSION.—82 S. W. (2d) 105.

Division One, April 17, 1935.

986

Roger A. Bailey for City of Sikeston.

*Frank Lowry* for City of Cape Girardeau.

*Fordyce, White, Mayne & Williams* and *N. W. Hartman* for Missouri Utilities Company.

*Sam O. Hargus,* General Counsel, and *James P. Boyd,* Assistant Counsel, for Public Service Commission.

*Blanton & Montgomery, amicus curiae.*

HYDE, C.—This is an appeal from a judgment of the Circuit Court of Cole County affirming an order of the Public Service Commission, which denied an application made by the City of Sikeston. The city's application, to the commission, stated that the Missouri Utilities Company was maintaining an electric light and power distribution system in the streets of the city after its franchise to do so had expired; that it had refused to remove its poles and wires therefrom after it had been directed to do so by resolution of the city council; and that the city owned and maintained a municipal electric light plant and distribution system, which was sufficient to care for the needs of its citizens and industries.

The relief sought from the Public Service Commission, and the status of the matter on this appeal, is stated in the brief filed on behalf of the city, as follows:

"(1)   That the certificate of public convenience and necessity granted by this Commission to the Public Service Company of Missouri on February 24th, 1925, in Case No. 4241 be set aside and for naught held;

"(2)   That the Commission make a finding of fact that there now exists no public necessity for the maintenance of an electric light and power distribution system of the Missouri Utilities Company upon the streets, avenues, alleys and public ways of the City of Sikeston, Missouri;

"(3)   That the Missouri Utilities Company be ordered to vacate the streets, avenues, alleys and public ways of the City of Sikeston, Missouri, and for such other and further orders and relief as to the Commission may seem just and proper.

"For all purposes herein the third prayer in this petition may be regarded as abandoned. It is not covered in the motion for rehearing subsequently filed." (The city concedes that the Commis-

sion has no power to remove the lines of the Utilities Company from its streets.)

The Utilities Company intervened in the proceeding before the Public Service Commission and took the position that all matters mentioned or referred to in the city's application were *res judicata* under the decision of this court en banc in State ex inf. Shartel, Attorney General, ex rel. City of Sikeston v. Missouri Utilities Co., 331 Mo. 337, 53 S. W. (2d) 394, 89 A. L. R. 607, and that the commission had no jurisdiction or authority to grant any of the relief asked for by the city. Briefs *amicus curiae* have been filed in support of the position of the Utilities Company, by attorneys representing citizens of Sikeston who desire that it continue to serve the community in competition with the municipal plant, and in support of the city's position, by attorneys representing the city of Cape Girardeau which is also served by the Utilities Company. There is no real dispute about the facts which seem to be material to this controversy. On November 17, 1902, the city granted a twenty-year franchise to the Sikeston Electric Light Company. Before this franchise expired on November 17, 1922, the original local company had sold out to a larger power company which operated in a number of southeast Missouri cities and towns. In 1923, this power company entered into negotiations with the city for another twenty-year franchise but no agreement was reached. The company, however, continued to operate in the city in 1923 and 1924, paying all taxes, including an annual city license tax. It furnished the only light and power service available to the city. In the latter part of 1924 this power company sold its southeast Missouri system to the present Utilities Company, which was then called the Public Service Company of Missouri but has since changed its name to the Missouri Utilities Company.

The Utilities Company made application to the Public Service Commission for its approval of this purchase, for its approval of the issuance of bonds and stocks to finance it, and also for its authority to operate the plants and lines purchased in all of the cities and towns which had been operated by the old power company. The approved purchase price was $2,750,000. To pay this purchase price and make additions and improvements the commission authorized the issuance and sale of $2,185,000, six and one-half per cent, ten-year first mortgage bonds, $400,000, seven per cent cumulative preferred stock, and 20,000 shares of no par common stock which it authorized the Utilities Company to sell to the Community Power & Light Company, a holding company, for $537,000. The commission further ordered that the Utilities Company "be and is hereby authorized to operate and do business as follows: Operate electric plants and properties at (here follow the names of 23 cities and towns, including Sikeston) together with various points in,

along, adjacent and now connected by said company's transmission lines and distribution systems in all of said towns and adjacent rural communities, industries and at other points in the counties of (naming 8 counties)." [15 Mo. P. S. C. 150.] It is this part of the order which the city calls a "certificate of public convenience and necessity" and which it seeks to have set aside. The preferred stock was largely sold to the public throughout the southeast Missouri territory in which the Utilities Company operated. The ten-year first mortgage bonds and the no par common stock was deposited, with other securities, with a trustee, and the holding company issued its own bonds against them and other property, and sold them to the public.

The Utilities Company continued, from the time of its purchase of this system up to the year 1931, to be the only source of supply of electricity for the city of Sikeston, and it also operated an ice plant in the city. In 1930 the city voted $150,000 bonds for the construction of a municipal light plant. This plant was constructed and commenced operations May 19, 1931. There was considerable evidence before the Public Service Commission, at its hearing in March, 1933, which was somewhat conflicting concerning the capacity of the municipal plant to serve all of the electrical and power needs of the city without adding new equipment and also concerning the cost of increasing the size of its plant. There was also evidence to show the capacity of the Utilities Company's system and the load it could carry. It was shown that there were approximately 1321 available users of current in the city, and that the city plant had 957 active meters and 88 inactive meters in vacant houses. It was also shown that the Utilities Company had a substantial business including the shoe factory, which was the city's largest industry. A petition was filed with the commission signed by 750 people asking that it "refuse to take any action that will deny to the public of Sikeston the right now enjoyed to buy electric service from the Missouri Utilities Company." The city officials claimed that if they had all of the business of Sikeston for the municipal plant, it would be possible either to make drastic reductions in rates or to give other substantial benefits to the citizens. Further facts about the controversy may be found in the opinion of this court in the ouster proceeding, brought by the city against the Utilities Company in August, 1931, State ex inf. Shartel, ex rel. City of Sikeston v. Missouri Utilities Company, supra.

This proceeding before the commission followed the refusal of this court, in that case, to oust the Utilities Company from the city. It is contended, on behalf of the city, that this court's decision in the ouster case was based upon the theory that the Utilities Company had municipal consent because it had the order from the commission to operate the plant it purchased, which it calls a certificate of con-

venience and necessity; that if it can get that order set aside it would have the right to successfully maintain an ouster suit; and that it has shown that the order was invalid because the city had no notice that such an order was contemplated. The Utilities Company takes the position that the former suit settled everything. It will, therefore, materially aid in making clear the issues now presented to see just what this court held in the ouster case. This court there held that, while municipal consent was still a necessary condition to the exercise of any rights by an electrical corporation in a city, nevertheless, upon the facts disclosed by the pleadings, the city of Sikeston was estopped, by its conduct and laches, "to say that respondent (Utilities Company) is without right or authority to engage in the electric business in the city of Sikeston and have reasonable use of its streets, avenues and alleys in connection therewith," or to say that "it has not conferred such rights and privileges upon respondent." It is plain that ouster was denied on the theory that the city could not, at that time, question the right of the Utilities Company to be and operate there. From the argument now made for the city, it would seem that reason for such holding by this court has not been fully appreciated. This ruling was not put solely upon the ground that the Utilities Company had obtained from the commission a certificate of convenience and necessity, nor even upon the ground that its permission to operate the properties purchased was a certificate of convenience and necessity (this court said "the order . . . which is referred to in respondent's return and answer as a certificate of convenience and necessity"); nor did this court hold that a finding by the commission, that there is no public convenience or necessity for continued service, "must be made before a court of equity will entertain an ouster proceeding." While this court did say that "it is not inappropriate to suggest that relator's claim that there now exists no public necessity for the electrical services supplied by respondent . . . vigorously urged in this proceeding, is a matter peculiarly within the jurisdiction of the Public Service Commission," we take it that what this court meant was that it had no jurisdiction to determine any such question; that, whether the contention was true or not, it was no ground for ouster in a *quo warranto* action; and that, whenever that question was material to the exercise of any right, the tribunal in this State, which had authority to pass upon it, was the Public Service Commission. The real basis for estoppel was that the city permitted the old power company to continue to operate after its franchise had expired, stood by and allowed the new Utilities Company to purchase its system for the purpose of continuing its operation, issue bonds and preferred stock and sell them to the public for the purpose of financing the purchase and improvement of this system, and allowed it to continue to operate and improve its plant for seven years thereafter,

when the city had no other source of electrical power, issuing it municipal licenses to operate, and accepting taxes from it, in connection with all the other facts and circumstances stated in the pleadings.

■ The question of the right of the Utilities Company to be operating in the city at the time the ouster suit was commenced is, therefore, for all time adjudicated. However, this does not mean that the city is perpetually estopped, and forever prevented from passing upon the question of whether the Utilities Company may have a franchise to remain in business in the city, or from ousting it therefrom if it does not choose to give it a further franchise, as *amicus curiae* seem to fear.

As this court said in the ouster case, the purpose of equitable estoppel is "to preserve rights already acquired and not to create new ones . . . not to work a positive gain to a party, but to protect him from a loss which he could not otherwise escape, and hence should be limited to what is necessary to put the parties in the same relative position they would have occupied if the predicate of the estoppel had never existed." [State ex inf. Shartel, ex rel. City of Sikeston v. Missouri Utilities Company, supra.] Moreover, as this court has said before, "there is no danger in recognizing the principle of an estoppel *in pais* as applicable to exceptional cases, since this leaves the courts to decide the question, not by mere lapse of time, but upon all the circumstances of the case to hold the public estopped or not, as right and justice may require." [Town of Montevallo v. School District, 268 Mo. 217, l. c. 223, 186 S. W. 1078, 1079; State ex rel. Consolidated School District v. Haid, 328 Mo. 739, 41 S. W. (2d) 806, l. c. 808.]

■ Furthermore, this court in the ouster case specifically and definitely held that municipal consent is still required, in addition to whatever requirements may be imposed by the commission, saying "Sections 4962 and 7683 (R. S. 1929), plainly make the consent of the municipality, in manner and form there indicated, an essential prerequisite to lawful exercise of the rights therein mentioned, and we find nothing in the Public Service Commission Act or in our decisions construing the same that lends any substantial support to respondent's suggestion that this statutory requirement has been repealed, or that the commission's grant of a certificate of public convenience and necessity is a grant of any privilege, franchise, or right, which municipalities, as agents of the State, are empowered to grant or withhold at their pleasure." [State ex inf. Shartel, ex rel. City of Sikeston v. Missouri Utilities Company, supra.] In other words, a certificate of the commission is only, where required, an additional condition imposed by the State to the exercise of a privilege which a municipality may give or refuse, and the commission is not to give its certificate to a company until after the city has consented that it may operate within its boundaries. Section

5193, Revised Statutes 1929, specifically makes this requirement. However, the conditions which a city may impose for granting a franchise, as for example provisions as to rates and service, are restricted by the powers over such matters given to the commission and are invalid if in conflict therewith. [State ex rel. City of Kirkwood v. Public Service Comm., 330 Mo. 507, 50 S. W. (2d) 114, l. c. 118; City of Cape Girardeau v. St. L.-S. F. Railroad Co., 305 Mo. 590, 267 S. W. 601, 36 A. L. R. 1488; City of St. Louis v. Public Service Comm., 276 Mo. 509, 207 S. W. 799.] ■ Additional requirements as to municipal consent are made, as to third and fourth class cities, by Sections 6815, 6917 and 7028, Revised Statutes 1929. Under these statutory provisions, the right of the Utilities Company to remain, because the city is estopped to deny its right to be there, could not be, in any event, for a longer period than twenty years. (This was conceded by counsel for the Utilities Company in the ouster case.) We do not say that the city is estopped for all of that period of time. The question of whether the Utilities Company can have a twenty-year right without the "consent of a majority of the qualified voters of the city, voting at an election held for such purpose" was not passed upon in the ouster case, and it is not presented for decision in this case. It may, however, be noted that the bonds issued by the Utilities Company, which were a part of the basis of estoppel, matured in ten years and that the statutes above cited and others limit the city officials in some of their powers to a ten-year period.

■ Having determined that some of these matters briefed and argued are not involved here, the issues actually presented can be briefly stated. In the present proceeding, the commission denied the application of the city on the ground that it had no jurisdiction or authority to grant any of the relief asked by the city. The only question before us is a question of law, namely: Does the commission have any authority to determine that there no longer exists any public necessity for the continuance of the business on electrical corporation in a certain city or area, or to order it, against its wishes, to cease and desist from its operations?

The commission held that its former order, authorizing the Utilities Company to operate the plants and system which it was allowed to purchase, "was proper enough as a part of such transfer but . . . cannot be regarded as the issue of a certificate of convenience and necessity;" that the grant of such certificate to an electrical corporation is only required an authorized in case of, "First, the beginning of construction of an electric plant; second, the commencing to exercise any right or privilege under any franchise" (Sec. 5193, R. S. 1929); and that the commission was not authorized to make, at the request of the city, "a finding that there now exists no public necessity for the maintenance of an electrical light and power dis-

tribution system by the Missouri Utilities Company upon the streets . . . of the city."

The commission clearly stated its position, as follows:

"The purpose of the statute requiring a finding of public convenience and necessity *before* authorizing a utility to enter a given field is obviously intended to prevent unnecessary duplication of service and undesirable competition. But if duplication of service and competition already lawfully exist (as is the case here), no machinery or procedure has been provided by which this Commission can put an end to such a situation. There are several instances in this State in which two or more utilities were occupying the same field and engaging in competitive services at the time the Commission was organized. If the Legislature had intended that this Commission could terminate the authority of either of such utilities it would have conferred appropriate powers upon the Commission, provided it had constitutional authority for such an act. But the Legislature made no such provision."

We hold that these conclusions of the commission are correct, and that it does not have any such authority. The part of the commission's former order approving the purchase and the method of financing it, which authorized the operation of these plants, was only descriptive of the purpose for which they were bought. It was entirely proper as a part of order approving the sale and did not require a separate application. There is no contention that the city did not know of the sale and the application for its approval and it certainly knew that the Utilities Company was buying them for the purpose of operating them and not to junk them. The "Public Service Commission Law" was intended to prevent overcrowding of the field in any city or area and thus "restrain cut-throat competition on the theory that it is destructive, and that the ultimate result is that the public must pay for that destruction." [State ex rel. Union Electric Co. v. Public Service Commission, 333 Mo. 426, 433, 62 S. W. (2d) 742.] To accomplish this the commission was given the authority to pass upon the question of the public necessity and convenience for any new or additional company to begin business anywhere in the State, or for an established company to enter new territory. To secure to the public all advantages to be gained from competition in obtaining fair rates and good service and also to protect them from its disadvantages, the commission was given authority to regulate rates, to investigate complaints about service, to compel companies to adequately serve all persons and industries in the territory in which they operate, to order improvements and safety equipment, and to authorize the abandonment or extension of lines and the financing of all improvements or purchases. The question of whether regulated monopoly or regulated competition will best serve the public convenience and necessity in a particular area

at any time is for the commission to decide, subject to the qualification that the commission must not act arbitrarily or unreasonably, which matter is reserved to be passed upon by the courts. [State ex rel. Electric Co. v. Atkinson, 275 Mo. 325, 204 S. W. 897.] But, as the commission holds, no provision was or ever has been made by the Legislature for the commission to eliminate competition between private companies already in existence and doing business in the same territory, at the time the "Public Service Commission Law" was passed, except to permit one company to buy the capital stock, franchises, and property of another. [Secs. 5194, 5195, R. S. 1929.] Nor is there any provision to prevent or eliminate competition between such companies and cities, which were engaged in or might enter the electric light and power business. To hold that any such power is implied, as is now contended, would be contrary to all prior interpretation of the "Public Service Commission Law."

This court has recognized "that a public utility is in its nature a monopoly; that competition is inadequate to protect the public, and, if it exists is likely to become an economic waste (State ex inf. Barker v. Kansas City Gas Co., 254 Mo. 515, 163 S. W. 854); and that regulation, in order to provide for efficient service, must "require the general public not only to pay rates which will keep public utility plants in proper repair for effective public service, but further, to insure to investors a reasonable return upon funds invested" (State ex rel. Washington University v. Public Service Comm., 308 Mo. 328, 272 S. W. 971); nevertheless, it has also recognized that there still may be situations in which competition could serve a useful public purpose. This court said in State ex rel. Union Electric Company v. Public Service Commission, 333 Mo. 426, 433, 62 S. W. (2d) 742:

"Article 4, of Chapter 33 (Sec. 5188 et seq.), Revised Statutes 1929 (Mo. Stat. Ann., art. 4, p. 33, sec. 5188 et seq.), contemplates the probability an even expectation that more than one power and light company will engage in business in the same area and even in the same municipality. Moreover, municipal ownership of such utilities is still provided for and we have held that they do not even come within the regulation of the act. [City of Columbia v. State Public Service Comm., 329 Mo. 38, 43 S. W. (2d) 813.] . . . Even though two power corporations may operate on the same schedule of rates, they may compete with each other in such matters as the character of service they render, the courtesy and efficiency of their employees in doing it, the modernization of their equipment and the economy of their operation, all of which are matters of some importance to consumers. We have not reached the place where such improvements in equipment and methods of operation and service cannot be further perfected. Self-interest in obtaining business and making profits is still, and apparently will continue to be, the greatest incentive in bringing about such advancements."

Likewise, it is said in a case where the commission permitted a new company to enter into competition with a company already established in the same territory, State ex rel. Electric Co. v. Atkinson, 275 Mo. 325, 204 S. W. 897:

"The act establishing the Public Service Commission . . . is indicative of a policy designed, in every proper case, to substitute regulated monopoly for destructive competition. The spirit of this policy is the protection of the public. The protection given the utility is incidental. The policy covers a particular case when competition would impair or destroy a utility and, as a consequence, eventually entail an increase of rates charged the public. . . . Ordinarily, high rates do not call for the introduction of competitive conditions. These, generally, are said to be correctible through appropriate regulation by the commission. . . . Nevertheless . . . it is held to be a practical system designed, as stated, to promote the public good and the particular facts in each case are to be regarded in applying it."

The policy of our Legislature concerning the light and power business, up to the present time, has been to leave the field open to both private and public ownership. In any case where the people are not satisfied with the results of regulation, the right of any city to build its own plant, without asking the permission of the commission, and to furnish electricity to its people at such rates and under such conditions as it sees fit, without being subject to any regulation except the will of its own citizens, remains as a further safeguard in the public interest. This certainly gives a city a considerable advantage in competing with a privately owned utility company subject to regulation by the commission. However, the entrance of a city into the electric business only brings another competitor into the field, just as happened when the commission granted a certificate of convenience and necessity to another private company in State ex rel. Electric Company v. Atkinson, supra. A city's entrance in the field neither adds to nor takes away from the commission's authority over private companies. The city has the right to compete, but by engaging in the business, it does not automatically terminate the rights of others to be there. When a private company's franchise to operate expires and the time comes for a city to give its consent to its extension, it may then obtain a monopoly for its own plant by refusing it. We hold that, before such time, it cannot do so except by purchase or by the voluntary withdrawal of the company. The judgment is affirmed. *Ferguson* and *Sturgis, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.