## MISSOURI PUBLIC SERVICE CO., Respondent,

v.

## CITY OF TRENTON and Trenton Municipal Utilities, Board of Public Works, Appellants.

### No. KCD 26546.

Missouri Court of Appeals, Kansas City District.

May 6, 1974.

Eugene E. Andereck, Pickett, Andereck, Hauck & Sharp, Trenton, for appellants.

Gary J. Brouillette, Judith J. Paxton, Kansas City, Mo., for respondent.

Before PRITCHARD, P. J., and SWOFFORD and SOMERVILLE, JJ.

SOMERVILLE, Judge.

This injunction action was generated by a confrontation between Missouri Public Service Co., plaintiff below (hereinafter referred to as the company), and the City of Trenton and Trenton Municipal Utilities, Board of Public Works, defendants below (hereinafter collectively referred to as the city), concerning the right to provide electric service to two private residences located outside the corporate limits of the city.

A brief recital of certain facts will suffice to illuminate the issues on appeal.

For many years the city (a third class city) owned and operated an electric power plant and transmission system to provide its inhabitants with electric service. The city's system incorporated a loop in its power grid.

Sometime prior to June 14, 1972, the city constructed certain sewage lagoons outside its corporate limits under authority of Section 71.680, RSMo 1969. Also prior to June 14, 1972, the city was in the process of constructing an additional loop in its power grid outside its corporate limits, running to its sewage lagoons and then back into its corporate limits. This additional loop was to serve a dual purpose, (1) to add an additional loop to the city's electric transmission system, and (2) to provide electric power for the operation of certain aeration equipment to be installed in the city's sewage lagoons. It stands undisputed that the additional loop in the city's power grid would give its electric transmission system "a more dependable source of energy, continuity of service and stable voltage throughout its system".

For many years the company, a privately owned public utility, possessed a certificate of convenience and necessity issued by the Public Service Commission to provide electric service to residences of the area beyond the city's corporate limits traversed by the additional power loop being constructed by the city, and the company had

been and was providing electric service to the residences located in the unincorporated area, including the two residences in question.

The company learned that the city intended to provide electric service to the two mentioned residences outside its corporate limits if the owners of the two residences constructed transmission lines to the city's additional loop where it ran alongside their property. Upon acquisition of such knowledge the company, on June 14, 1972, filed suit to enjoin the city from constructing the additional power loop beyond its city limits and from providing electric service to the two non-city residences. The trial court issued a temporary injunction restraining the city from furnishing electric service to the two residences in question, and, following an evidentiary hearing, issued a permanent injunction restraining the city from furnishing electric service to the two non-city residences, "from that part of . . . [city's] . . . electrical facilities constructed outside the city limits of the City of Trenton, Missouri. However, this restraining order shall not be deemed to prohibit such persons from taking electrical services from . . . [City] . . . from that part of . . . [city's] . . . electrical facilities constructed within said city limits; nor be deemed to prohibit construction of electrical facilities by . . . [city] . . . outside the city limits of said city."

The city appealed from being so enjoined, asserting three grounds for appellate relief: (1) non-city residences may be served by a city owned and operated electric power plant and transmission system from a transmission line constructed by a city outside its city limits if (a) the transmission line constructed by the city beyond its corporate limits was constructed for a lawful purpose and (b) the owners of the non-city residences construct, at their expense, transmission lines to the transmission line constructed by the city; (2) the company had an adequate remedy at law,

hence, it was not entitled to relief in equity; and (3) the company was not the real party in interest, since only a tax-paying resident of the city or the Attorney General have any legal standing to complain that the city was acting in excess of its authority.

The three grounds asserted by the city will be inverted for disposition since (3) and (2) lend themselves to perfunctory disposition.

In the recent case of Missouri Cities Water Company v. City of St. Peters, Missouri, 508 S.W.2d 15 (1974), the Missouri Court of Appeals, St. Louis District, ruled that a privately owned public utility possessed legal standing to come into a court of equity to enjoin threatened action by a municipally owned utility to illegally extend its utility service beyond its corporate limits into an area being lawfully served by the complaining privately owned public utility.

Ground (1) urged by the city is a different matter and presents a somewhat vexing question. A recapitulation of certain facts heretofore delineated points up the vexatious nature of the question. There was certainly sufficient evidence for the trial court to find that the city in constructing the additional loop outside its corporate limits was motivated by two primary reasons, namely, (1) to add another loop to its electric transmission system, and (2) to provide power to operate aerating equipment at its sewage lagoons located beyond its city limits. The city relies on Section 71.680, RSMo 1969, V.A.M.S., for authority to construct the additional loop beyond its city limits to its sewage lagoons. Section 71.680, supra, empowers a third class city to dispose of waste beyond its corporate limits and to "acquire . . . within or without the corporate limits of such cities . . . all equipment necessary or expedient for use in . . . disposition of . . . municipal waste; . . . ." and to "acquire . . . purification plants or sewage disposal plants for the

purification of all sewage accumulating in such cities." It should be specifically noted that this court is not required to determine whether the city was lawfully authorized by Section 71.680, supra, to construct the additional loop beyond its corporate limits, since the company chose not to appeal that portion of the judgment below which, in effect, held that construction of the additional loop by the city beyond its corporate limits was lawful. Thus ground (1) has been narrowed, since determination of whether the city was lawfully empowered to construct the additional loop beyond its corporate limits has been eliminated from consideration.

■ Certain additional prefatory matters appear indicated prior to reaching the merits of ground (1) asserted by the city. The company contends that if the city has any surplus power to sell to non-residents of the city, "any non-resident desiring to purchase power must do so from that part of" the city's "electrical facilities constructed within the city limits". It should also be noted that there is a unanimity of agreement between the city and the company that, under any circumstances, the city can sell only surplus power. In this connection, see Speas v. Kansas City, 329 Mo. 184, 44 S.W.2d 108 (1931) and Taylor v. Dimmitt, 336 Mo. 330, 78 S.W.2d 841 (1934).

Section 91.010, RSMo 1969, V.A.M.S., empowers "any city . . . in this state . . . to erect, purchase, acquire, maintain and operate . . . power plants" and "electric light plants . . . and to supply the inhabitants of such cities . . . with . . . light . . . and power therefrom". Section 91.020, RSMo 1969, V.A.M.S., empowers "[a]ny city in this state, which owns and operates any electric light or power plant . . . to, supply electric current from its light or power plant to other municipal corporations for their use and the use of their inhabitants, and also to persons and private corporations for use beyond the corporate

limits of such city . . .". Section 91.-030, RSMO 1969, V.A.M.S., empowers "[a]ny city . . . having authority to maintain and operate an electric light and power plant" to "procure electric current for that purpose from any other city, owning and operating such plant . . .". Section 91.040, RSMo 1969, V.A.M.S., empowers "[a]ny city . . . which any city of this state, having an electric light or power plant, may agree to supply with electric current under the provisions of sections 91.020 and 91.030 . . . to erect poles . . . wires and other fixtures . . . across or under any of the public roads, streets and water . . . and to put in and maintain and operate all apparatus and devices necessary for and in conducting said current from the city agreeing to supply the same into its own limits in, upon, over and through any territory of this state outside, as well as within, the limits of said city, . . .". Authority for the city to sell surplus power to non-resident consumers lies in Section 91.-020, supra; but Taylor v. Dimmitt, supra, holds, as hereinafter demonstrated, that Sections 91.010, 91.030 and 91.040 circumscribe the mode of doing so.

Taylor v. Dimmitt, supra, represents a careful and exhaustive analysis of the above statutes and both the city and company cite and primarily rely on *Taylor* as authority for their respective positions. Therefore, it behooves this court to carefully analyze *Taylor*. The plaintiffs in *Taylor* were resident taxpayers of the City of Shelbina, Missouri, who filed suit to enjoin the mayor and aldermen of the City of Shelbina from erecting or operating a proposed electric transmission line to sell surplus electric power from Shelbina's municipally owned and operated electric plant to the inhabitants of the unincorporated village of Lakenan, Missouri, located some five miles east of the corporate limits of Shelbina, and to persons residing in the area between Lakenan and Shelbina along the route of the proposed electric transmission line. The trial court granted the

plaintiffs in *Taylor* the relief requested and the Supreme Court affirmed the judgment of the trial court. In doing so the court addressed Section 7641, RSMo 1929 (now Section 91.010, supra), originally enacted by Laws 1891, and at 1. c. 842 [Taylor v. Dimmitt, 78 S.W.2d 841] said: "This section is in accord with the primary objects to be accomplished by a municipal corporation; that is, to promote the welfare and public interest of its inhabitants, and not the promotion of the interests of those residing outside its corporate boundaries." The court then noted (1. c. 842) that prior to 1911, at which time Sections 7642, 7643, and 7644, RSMo 1929 [now, respectively, Sections 91.020, 91.030, and 91.-040, supra] were enacted [Laws 1911, p. 351], cities could own and operate electric light and power plants for but a singular purpose, that of servicing their own inhabitants. In tracing the legislative history of Sections 7642, 7643, and 7644, RSMo 1929 [now, respectively, Sections 91.020, 91.030, and 91.040, supra] the court emphasized that the referred to sections, when enacted, were constituent parts of a single act amending Article XXIII, Chapter 84 RSMo 1909 [which, among other sections, contained Section 7641, RSMo 1929 (now Section 91.010, supra)] and were, therefore, to be construed together. The court stressed (1. c. 843) that cities in supplying electric service to consumers beyond their corporate limits "perform no municipal function, but depart from the primary objects for which they have existence, and enter a field of private business". Also (1. c. 843) the court reaffirmed the following classic principle of law relative to the power possessed by municipal corporations:

" 'It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: (1) Those granted in express words; (2) those necessarily or fairly implied in, or incident to, the powers expressly granted; (3) those *essential* to the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied.' St. Louis v. Kaime, 180 Mo. loc. cit. 322, 79 S.W. 140, 143 (quoting Dillon, Municipal Corp. vol. 1 [4th Ed.] p. 145); State v. Butler, 178 Mo. 272, 77 S.W. 560; St. Louis v. Dreisoerner, 243 Mo. 217, 147 S.W. 998, 41 L.R.A.(N.S.) 177; St. Louis v. King, 226 Mo. 334, 126 S.W. 495, 27 L.R.A.(N.S.) 608, 136 Am. St.Rep. 643; Maryville v. Farmers' Trust Co., 226 Mo.App. 641, 45 S.W.2d 103."

After carefully examining the referenced statutory enactments in light of established principles of statutory construction, and having weighed numerous authorities from other jurisdictions, the court in *Taylor* concluded, particularly in view of the above quoted principle, that the statutory provisions in question did not authorize a city to construct, maintain, and operate an electric transmission line beyond its city limits for the purpose of selling surplus electric power to non-resident individual consumers, since it lacked authority to do so with respect to selling surplus electric power to other municipalities. More precisely, the court in *Taylor*, 1. c. 845, stated, "[t]he apparent logical conclusion to be drawn from the legislation [now sections 91.010, 91.020, 91.030 and 91.040, supra] is that the Legislature knowingly and purposely withheld . . . from the city owning the plant *the authority to* construct, *maintain, and operate* an electric transmission line outside its corporate limits for the purposes within the act". (Emphasis added.)

■ The city seeks to escape the "apparent logical conclusion" drawn in *Taylor* on the basis of a bifurcated argument. First, that *Taylor* should be construed as holding *that a municipality is only prohibited from constructing* an electric transmission line beyond its corporate limits for the purpose of *selling surplus power to non-resident consumers*, but is not prohibited

from selling surplus power to them from an electric transmission line maintained and operated by it beyond its corporate limits if the electric transmission line was constructed for other lawful purposes, and, second, "[w]hat would be the rationale of the useless act of requiring" non-resident consumers "to build to the line to the city limits rather than to build to the line at its closest point in the loop."

■ Neither "escape" urged by the city from the "apparent logical conclusion" drawn in *Taylor* is convincing. As to the first branch of the city's bifurcated argument, this court believes that *Taylor* means exactly what it says—" . . . that the Legislature knowingly and purposely withheld . . . from the city owning the plant . . . *the authority* to construct, *maintain, and operate* an electric transmission line outside its corporate limits for the purposes within the act." (Emphasis added.) Maintenance and operation of an electric transmission line by a city outside its corporate limits to serve non-resident consumers, as well as construction of an electric transmission line beyond its corporate limits for such purposes, constitute three separate and distinct powers, none of which are organically possessed by a city, and Sections 91.010, 91.020, 91.030, 91.-040, supra, do not expressly or impliedly invest a city with any of such powers. Taylor v. Dimmitt, supra.

■ At first blush the second branch of the city's bifurcated argument for "escape" from the "apparent logical conclusion" drawn in *Taylor* appears to have substance and to constitute a syllogistic and practical argument. In other words, do the practical aspects presented by this case, in view of the particular facts involved, outweigh what otherwise might be construed as a dogmatic application of the "apparent logical conclusion" drawn in *Taylor?* This court concludes that they do not. The General Assembly of the State of Missouri many years ago, by enactment of the Public Service Commission

Law (now Chapter 386 RSMo 1969, V.A. M.S.), wisely concluded that the public interest would best be served by regulating public utilities. As stated in State ex rel. Electric Co. v. Atkinson, 275 Mo. 325, 204 S.W. 897, 899 (Mo.1918), "[t]he act establishing the Public Service Commission . . . is indicative of a policy designed, in every proper case, to substitute regulated monopoly for destructive competition. The spirit of this policy is the protection of the public." Territorial access between competing utilities is one subject of regulation. However, the company tacitly concedes that municipally owned and operated electric utilities are not subject to regulation by the Public Service Commission in this respect. In this connection, see State ex rel. City of Sikeston v. Public Service Commission of Missouri, 336 Mo. 985, 82 S.W.2d 105 (Mo.1935). On the other hand, as demonstrated by *Taylor,* municipally owned electric utilities have only such extraterritorial powers as the General Assembly deems fit to give them, and, in this sense, are regulated by the General Assembly. Since the purpose of regulating utilities is to "substitute regulated monopoly for destructive competition", thereby serving the public interest, the underlying rationale justifying regulation by an authoritative body (by the General Assembly in the instance of municipally owned electric utilities) would seem to apply with equal vigor to municipally owned and operated electric utilities. To recognize the second branch of the city's bifurcated argument as a valid "escape" from the "apparent logical conclusion" drawn in *Taylor* would eviscerate the public interest intended to be served by regulating utilities. Granted, competition in the instant case appears minimal and has by no means reached the threshold of "destructive competition". But should this court circumvent the well reasoned conclusion drawn in *Taylor* simply because the competition is minimal? Even though the competition is minimal, the theory underlying regulation of utilities would be breached to some extent to do so. The theory underlying regu-

lation of utilities should be just as viable in the instance here, where minimal competition is involved, as if the city were threatening to serve countless numbers of non-resident consumers. Protection of the public, wherein utility regulation is rooted, appears best served if regulation is effectively imposed when the type of competition subject to control is at a minimal state, rather than delaying its imposition until such has reached a state of "destructive competition".

Judgment affirmed.

All concur.